#21813-a-DG

**2006 SD 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

BRILEY PIPER,                             Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE WARREN G. JOHNSON
Judge
* * * *

LAWRENCE E. LONG
Attorney General

CRAIG M. EICHSTADT
Deputy Attorney General
SHERRI SUNDEM WALD
GRANT GORMLEY
GARY CAMPBELL
Assistant Attorneys General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.

TIMOTHY J. RENSCH
Rensch Law Office
and
PATRICK DUFFY
Duffy and Duffy
Rapid City, South Dakota                  Attorneys for defendant
                                          and appellant.

* * * *

ARGUED MARCH 24, 2004

OPINION FILED **01/04/06**

#21813

Introduction .................................................................................................................¶ 1

Facts and Procedure.........................................................................................¶ 2 - ¶ 11

Analysis and Decision
    1.  Undisclosed agreement between State and cooperating witness....................¶ 12 - ¶ 22
    2.  Cruel and unusual punishment ................................................................¶ 23 - ¶ 24
    3.  Proportionality of death sentence to similar cases ...................................¶ 25 - ¶ 43
    4.  Failure of indictment to allege any aggravating circumstances...................¶ 44 - ¶ 45
    5.  Capital sentencing scheme violates right to jury trial ...............................¶ 46 - ¶ 68
    6.  Proportionality of sentence to co-defendant Hoadley's sentence ....................¶ 69 - ¶ 99

Dissenting Opinion, Sabers, J. ...............................................................................¶100
    5.  Capital sentencing scheme violates right to jury trial ...................................¶101 - ¶114
    6.  Proportionality of sentence to co-defendant Hoadley's sentence ...................¶115 - ¶121

GILBERTSON, Chief Justice.

[¶1.] Briley Piper (Piper) pleaded guilty to felony murder, kidnapping, robbery in the first degree, burglary in the first degree, and grand theft. After waiving his right to a jury trial and sentencing by jury, the circuit court sentenced Piper to death by lethal injection on the murder charge. He now appeals and raises several issues for our review. For the reasons stated herein, we affirm**.**

## FACTS AND PROCEDURE

[¶2.] On March 12 -13, 2000, Piper and two others, Elijah Page (Page) and Darrell Hoadley (Hoadley), kidnapped and killed Chester Allan Poage (Poage) so that they could steal property from the home Poage lived in with his mother and sister in Spearfish, South Dakota.

[¶3.] Piper, Page and Hoadley, all of whom were friends with each other and with Poage, met up with Poage at approximately 8:00 p.m. on March 12, 2000. Piper had informed another friend, Nathan Whartman (Whartman), that Poage would give

him a ride to the Job Corps facilities. Poage complied with the request for the ride, and he, along with Piper, Page and Hoadley, picked Whartman up and dropped Whartman off at Job Corps. The remaining four then went to Poage's house and played PlayStation games.[1] While there, Piper, Page and Hoadley convinced Poage to leave his house, and the four left in Poage's 1997 Chevrolet Blazer.[2] All four ended up at the house in which Piper, Page and Hoadley had been staying.

[¶4.]        Once there, Page exposed a .22 caliber pistol, which he had stolen from Poage's mother's room at the Poage residence, and ordered Poage to get on the floor. Once Poage was on the floor, Piper kicked him in the face, knocking him unconscious. While Poage was unconscious, he was tied up with a cord and sat upright in a chair. After he regained consciousness, Piper laid a tire iron across his feet to prevent him from moving, while Page made him drink a mixture containing crushed pills, beer and hydrochloric acid. During this time, Poage begged for an explanation as to why his alleged friends were doing this. In response, Page hit him in the face and told him to "shut up." While Piper and Page discussed their plan to kill Poage, which included slitting the victim's throat, Poage pleaded for his life and offered to give them

---

1.      Poage's mother and sister were on vacation in Florida at this time.

2.      Testimony as to the origin of the plot to kill Poage and steal his property varies. It is unclear whether all three of the assailants planned on stealing items in the house so they could buy LSD, or whether Piper pulled Page outside to inform him he was going to steal stereo equipment from Poage's vehicle. It is also unclear whether they initially planned to kill Poage, or just beat him up. However, it is clear that the initial discussions as to killing Poage were limited to Piper and Page, and only after it was decided to kill him was Hoadley informed of the plan.

them everything he owned in exchange for his release. At this point, Page asked Poage for the personal identification number for his ATM card, and Poage gave it to him.

[¶5.] Next, the group escorted Poage to his own vehicle, placed him in the back seat and threatened his life if he attempted to escape. Piper got in the driver's seat. The group stopped at a gas station, and then Piper drove the group to Higgins Gulch in the Black Hills, a wooded area about seven miles away from the house where Piper, Page, and Hoadley had been staying. Upon arriving at Higgins Gulch, the group forced Poage out of his vehicle into twelve-inch deep snow. Poage was forced by Piper and Page to take off all of his clothes, except his tank-top style undershirt, shoes, and socks in temperatures of about twenty-five degrees Fahrenheit. The three young men then took Poage's wallet.

[¶6.] Thereafter, the three tried holding Poage down and covering him up with snow. Poage was then escorted to an icy creek, just over fifty feet from the road they had driven on to reach the gulch. Page and Piper admitted kicking him numerous times in various parts of his body and head. At one point in the attack, Poage did try to escape, but upon Piper's urging, Page recaptured him and continued to beat his near-naked body in the freezing temperatures. Poage was also made to lie in the icy creek water for a lengthy period of time. Piper later stated he had kicked Poage at the gulch a couple of times in the body and a couple of times in the head. Throughout the beatings, Piper laughed and said things like "Ohh … like that would suck" and "Ah, that's got to hurt."

[¶7.]	At one point, Poage asked to be let into his vehicle to warm himself. The record indicates that Poage said he preferred to bleed to death in the warmth rather than freeze to death in the cold. Piper agreed to grant his request, so long as he washed the blood off of his body in the creek. After rinsing in the icy waters, Piper refused to let him warm himself in the vehicle. Instead, they continued beating and taunting Poage.

[¶8.]	Next, Poage was dragged back into the creek, where Piper and the others attempted to drown the victim. The co-defendants' stories diverge somewhat on the final fate of Poage. One witness stated that Piper admitted standing on Poage's neck to help Hoadley drown him, then Piper stabbed him twice or more -- once by the ear and then under the chin. Piper's brief contends he did not participate in the drowning attempts or stabbings, but instead that he went back to Poage's vehicle. After the drowning attempts, stabbings, beatings and stoning, Poage was still moving. According to Piper, Hoadley threw the final rock that killed Poage, but at that point Piper was not there to personally witness this act. Both Page and Hoadley admitted they jointly dropped large rocks on Poage's head, actions which they believed finally killed him. Approximately four hours after the three kidnapped Poage, and about three hours after the beatings began at the gulch, Poage was left for dead in the creek.

[¶9.]	Piper drove the three away from the secluded area in Poage's vehicle, and they proceeded to discuss how they would divide Poage's property. They went to Poage's house and stole numerous items. The group then drove to Hannibal, Missouri, together. There, they visited Piper's sister, but upon her refusal to let them

stay, they headed back to South Dakota.  The group returned to Rapid City, South Dakota, using Poage's ATM card for cash and pawning some of Poage's property throughout the trip.[3]  Eventually, the three went their own ways.  Piper ultimately ended up in his home state of Alaska.[4]

[¶10.]	On April 22, 2000, over a month after the three left Poage for dead, a woman who owned land near Higgins Gulch spotted what was later determined to be Poage's remains in the creek.  His body was found, clad in a sleeveless t-shirt, socks and shoes.  Donald Habbe (Habbe), a forensic pathologist from the Clinical Laboratory in Rapid City, performed an autopsy on the body.  Habbe discovered numerous head injuries and stab wounds.  Some examples of the head injuries inflicted included:  stab wound to the jugular vein, another stab wound through the skull, and a complex, spider-web shaped skull fracture that measured five inches.  Habbe determined the cause of death was the "stab wounds and the blunt force injury to the head."

---

3.	Records from Poage's bank show the ATM card was used six times in various locations in South Dakota and Nebraska.  Some of Poage's property was later found at pawnshops in Wyoming and Missouri.

4.	When the trio returned to Spearfish, C.R., Hoadley's juvenile girlfriend, testified that she saw the three unpack the stolen PlayStation, video games and many other items from Poage's house.  C.R. also testified that Piper confessed the murder to her in detail.  She said Piper laughed about the killing as he told her about it, "and thought it was just like a really cool neat thing." Another friend of Piper's, Jeff Deux, testified that Piper confessed to him as well and confirmed the nonchalant attitude, stating, Piper acted "a bit cocky" while telling the story of the beatings.

[¶11.]        After the body was discovered, Piper became a suspect. Law enforcement from South Dakota tracked him down in Alaska, questioned him and arrested him for first degree murder. While still in Alaska, he gave a detailed statement describing Poage's murder and his participation in it to South Dakota law enforcement. He was subsequently extradited to South Dakota. Piper was then jailed in Lawrence County, South Dakota. He later pleaded guilty to, and was convicted of, first degree felony murder; kidnapping; robbery in the first degree; burglary in the first degree; and grand theft. A sentencing hearing began on January 17, 2001, and lasted for three days. At the hearing, the State argued for the death sentence, and Piper argued against imposing such a sentence. After argument, the circuit court ruled that the death penalty would be imposed for the first degree murder conviction. Thereafter, co-defendant Page also pleaded guilty to the same charges, and after an extensive sentencing hearing, he was also sentenced to death by the same judge. Hoadley then stood trial in front of a jury on the same charges.[5] He was found guilty of the same charges but the jury sentenced him to life in prison. *See* State v. Hoadley, 2002 SD 109, 651 NW2d 542. Thereafter, Piper appealed to this Court. We remanded Piper's case to the circuit court for an intra-case proportionality review after a jury sentenced co-defendant Hoadley to life imprisonment. The circuit court held a hearing and subsequently entered findings of fact and conclusions of law

---

5.        The same circuit judge also presided over the Hoadley trial. Well experienced in capital cases, the circuit judge previously sat with this Court by designation in *State v. Moeller*, 1996 SD 60, 548 NW2d 465 (*Moeller I*); *State v. Moeller*,

(continued . . .)

fact and conclusions of law affirming Piper's death sentence. He now appeals the

following issues:

> 1. Whether the circuit court erred in finding there was no undisclosed agreement between the State and a cooperating witness.
>
> 2. Whether the imposition of the death penalty upon Piper constituted cruel and unusual punishment.
>
> 3. Whether Piper's sentence of death was grossly disproportionate to other cases in South Dakota wherein the death penalty was imposed or could have been imposed.
>
> 4. Whether the circuit court had jurisdiction to impose the death penalty when aggravating circumstances were not presented or alleged in an indictment or information.
>
> 5. Whether South Dakota's capital sentencing scheme in nonjury trials violates the Sixth Amendment right to a jury trial as incorporated to the states through the Fourteenth Amendment.
>
> 6. Whether Piper's sentence of death was grossly disproportionate to co-defendant Hoadley's sentence of life imprisonment without the possibility of parole.

### ANALYSIS AND DECISION

[¶12.] **1. Whether the circuit court erred in finding there was no undisclosed agreement between the State and a cooperating witness.**

[¶13.] After oral arguments in Piper's first appeal, we remanded Piper's case to

the circuit court for *inter alia* a determination as to whether there had been an

undisclosed agreement between the State and witness Tobe Givens (Givens). On

remand, the circuit court held two evidentiary hearings. After conducting the

---

(. . . continued)

2000 SD 122, 616 NW2d 465 (*Moeller II*); and *State v. Rhines*, 1996 SD 55, 548

(continued . . .)

hearings, the court rejected Piper's claim of an undisclosed agreement and entered findings of fact and conclusions of law to that effect. The circuit court specifically concluded "[t]here were no other sentencing concessions made by the State to Givens in exchange for Givens' testimony other than those found in the [previous] plea agreement." Piper now renews his argument claiming he was denied due process of law because the State failed to disclose that Givens testified in the hope he would receive an early release from jail.

[¶14.]     At Piper's sentencing hearing, three inmates from the Lawrence County jail testified that Piper confessed to them about partaking in Poage's murder. The inmates were Kenneth Tingley (Tingley), Tom Curtis (Curtis), and Givens. These witnesses also testified about a plan Piper had concocted to escape from jail, which involved murdering jail guards.[6]

---

(. . . continued)
    NW2d 415 (*Rhines I*).

6.    Tingley testified first regarding conversations he had with Piper while the two were on the same jail block. Although the two were not cell mates, Tingley testified that they spent a lot of time together, and that Piper confessed to taking part in Poage's murder. Tingley also testified that he had plotted an escape from jail with Piper and Givens. He testified that he was to kill one of the guards. Givens was to kill another and grab the keys. Then, Piper was going to grab Hoadley and escape out the back door where they would meet C.R. and "run for it." Tingley also claimed Piper offered him $10,000 to help out with the escape. Prior to divulging information about Piper's confession and escape plan, the State asked Tingley if he had made a plea agreement, and he replied that he had not.

Next, Curtis testified that Piper had confessed to murdering Poage, and gave a fairly detailed rendition of the facts Piper allegedly presented to him. He also testified that Piper wanted to escape from jail by going to the library, taking two women guards hostage, and killing them by either breaking their necks or

(continued . . .)

[¶15.] Givens was the third inmate who testified for the State at the sentencing hearing. Givens admitted entering a plea agreement, which reduced an aggravated assault to a simple assault in exchange for his testimony. At the time of the sentencing hearing, he committed two more simple assaults, for which he claimed he was sentenced to, and would be spending, a year in jail.

[¶16.] Givens claimed Piper offered him $50,000 to kill one of the guards and aid in Piper's escape. He further alleged that he was supposed to get into a fight with one of the female guards, and that he had even tried to call C.R. for Piper to let her know what day they would plan the escape so she could pick them up. Givens also testified regarding the version of facts surrounding Poage's murder that Piper gave

---

(. . . continued)

sticking pencils in their necks. Curtis' role in the escape was to go after one of the male guards. Curtis, too, stated that Piper offered to pay him for his help, and that they would have to get Hoadley out of prison. Curtis' testimony indicated that Piper wanted to get Page out of jail and kill him for being a "narc." Curtis also stated that Piper had found a paper clip, which he planned to use to take off his shackles and handcuffs while in the recreation yard. Curtis was released from jail based on a plea agreement with the State. Piper gave him his clothes and $68 upon his release. This, Curtis testified, was supposed to be in exchange for Curtis clipping the wires on the fence surrounding the jail once Curtis had been released in order to help Piper escape. At Piper's sentencing hearing, Curtis testified that he reported these escape plans to law enforcement through his attorney because he did not want anyone else to get hurt. On direct examination, he did say that he had entered a plea bargain with the State, and was granted credit for time served, a fine, and had to stay "in contact" with the Piper case. On cross-examination he stated that he was not receiving any benefit by testifying against Piper; rather, he felt it was his civic duty. On further cross- examination, however, he disclosed that he pleaded guilty to one simple assault charge, receiving a sentence of time served and fines, in exchange for dismissal of two aggravated assault charges, a first degree burglary charge, a felony hit and run, a simple assault and an obstructing justice charge.

him, including the torture, forcing Poage to drink the hydrochloric acid concoction, and the beating at Higgins Gulch.

[¶17.] After the sentencing hearing, the state's attorney's office did not object to the release of Givens for time served on his simple assault charges. An affidavit of the State's Attorney relates that the prosecutor delivered Givens' request for the sentence reduction to the sentencing judge for Givens and even commented on Givens' good behavior in jail. Piper argues that Givens' subsequent reduction in sentence is suspicious and points to collusion between the State and Givens. He argues that the State secretly promised additional benefits to Givens for his testimony at Piper's sentencing hearing. Thus, Piper alleges that the State

violated a discovery order requiring all information regarding consideration, promises or favorable treatment given State's witnesses be disclosed, thereby violating his due process rights and as well as creating a Confrontation Clause violation.

[¶18.]      The standard of review applicable to prosecutorial misconduct claims is the abuse of discretion standard. State v. Corey, 2001 SD 53, ¶19, 624 NW2d 841, 845. "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible method." State v. Lee, 1999 SD 81, ¶21, 599 NW2d 630, 634 (citing State v. Knecht, 1997 SD 53, ¶17, 563 NW2d 413, 420 (quoting State v. Davi, 504 NW2d 844, 855 (SD 1993))). We will not reverse based on prosecutorial misconduct unless there is prejudicial error. *Id.* "Prejudicial error is error which in all probability produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Id.* (citing State v. Hofman, 1997 SD 51, ¶13, 562 NW2d 898, 902 (quoting Robbins v. Buntrock, 1996 SD 84, ¶6, 550 NW2d 422, 425)). In this case, Piper has not demonstrated that any misconduct occurred. The record indicates that Givens sent the State's Attorney a letter requesting that the prosecution schedule a hearing to reduce his sentence. The prosecutor received it, met with Givens, visited with law enforcement personnel about Givens' behavior while in jail, and decided not to object to an early release. Additionally, Givens had previously requested a reduction in sentence, but the judge informed him it would require a favorable recommendation from his "captors" prior to

considering the request.[7] There is no evidence that this violated the discovery order requiring plea bargain disclosure. Thus, we address the alleged constitutional violations, which we review de novo. State v. Martin, 2003 SD 153, ¶13, 674 NW2d 291, 296 (citing Wegleitner v. Sattler, 1998 SD 88, ¶4, 582 NW2d 688, 689).

[¶19.] We have held the State's failure to disclose evidence may result in a violation of due process. State v. Leisinger, 2003 SD 118, ¶14, 670 NW2d 371, 375-75.[8] We stated in *Leisinger*, that "[i]n *Brady v. Maryland*, 373 US 83, 83 SCt 1194, 10 LEd2d 215 (1963), the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" 2003 SD 118, ¶14, 670 NW2d at

---

7.    The sentencing judge in Givens' case testified at the remand hearing for Piper. The sentencing judge testified it was his "common practice" to grant early release to persons convicted of a misdemeanor who originally received the maximum sentence. This early release was precipitated when the sentencing judge learned that Givens' behavior had improved in jail, that he had enrolled at Black Hills State University and he was willing to take anger management counseling. The sentencing judge testified at the remand hearing he was unaware when he reduced Givens' sentence that Givens had testified at Piper's sentencing hearing. The sentencing judge testified, "I did not let this man out of jail because he testified favorably in the matter of State of South Dakota, Plaintiff, versus Briley Piper, Defendant. That had nothing to do with it."

8.    The four part test announced in *State v. Gonzalez*, 2001 SD 47, ¶11, 624 NW2d 836, 839, was abandoned by this Court in *Leisinger*, 2003 SD 118, ¶13, 670 NW2d at 374, after developments in the federal court system refined *Brady* suppression analysis to a three part test. *Leisinger*, 2003 SD 118, ¶13, 670 NW2d at 374 (citing Strickler v. Greener, 527 US 263, 119 SCt 1936, 144 LEd2d 286 (1999); United States v. Carman, 314 F3d 321 (8thCir 2002)).

374 (quoting *Strickler*, 527 US at 280-282, 119 SCt at 1948-49, 144 LEd2d 286). *See also, Gonzalez*, 2001 SD 47, ¶1, 624 NW2d at 839 (holding State must produce evidence favorable to defendant upon request) (quoting *Brady*, 373 US at 87, 83 SCt at 1196-97, 10 LEd2d 215); State v. Gillespie, 445 NW2d 661, 665 (SD 1989) (holding the State must produce evidence favorable to defendant upon request) (citing State v. Sahlie, 90 SD 682, 687, 245 NW2d 476, 479 (1976); State v. Clabaugh, 346 NW2d 448, 450-51 (SD 1984) (finding due process requires State to produce information favorable to defense) (citing *Brady*, 373 US 83, 83 SCt 1194, 10 LEd2d 215; State v. Parker, 263 NW2d 679 (SD 1978)). And, "evidence that could be used to impeach a witness for the prosecution falls within the *Brady* rule." Reutter v. Solem, 888 F2d 578, 581 (8thCir 1989) (citing United States v. Bagley, 473 US 667, 676, 105 SCt 3375, 3380, 87 LEd2d 481 (1984)). In addition, a new trial shall be granted if a true *Brady* violation has occurred, which is determined by answering three questions in the affirmative: "(1) was the evidence at issue favorable to the defendant because it is exculpatory or impeaching, (2) was the evidence suppressed by the State either willfully or inadvertently, and (3) did prejudice ensue from the suppression." *Leisinger*, 2003 SD 118, ¶14, 670 NW2d at 375 (quoting *Strickler*, 527 US at 280-282, 119 SCt at 1948-49, 144 LEd2d 286).

[¶20.]    In this case, the record does not indicate the State failed to disclose any information to the defense. Nothing indicates that the State negotiated Givens' early release in exchange for his testimony. Further, all of the information regarding plea agreements appears to have been disclosed prior to the sentencing hearing. Based upon the record before us, we have no reason to overturn the circuit court's finding

that the State did not enter into an undisclosed agreement with Givens in order to secure his testimony. Absent such a finding that the State withheld evidence that Piper could have used to impeach Givens, Piper is unable to establish that a due process violation occurred.

[¶21.] Finally, under this issue, we address the potential Confrontation Clause violation. The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" *See* Crawford v. Washington, 541 US 36, 124 SCt 1354, 158 LEd2d 177 (2004) (recent Supreme Court opinion tracing the history of a defendant's right to confront his accuser). Similarly, the South Dakota Constitution states: "In all criminal prosecutions the accused shall have the right to ... demand the nature and cause of the accusation against him; to have a copy thereof; to meet the witnesses against him face to face[.]" SD Const art VI, § 7. In *State v. Karlen*, we stated that the "Confrontation Clause provides two specific protections for criminal defendants. The first is the right to face his accusers and the second is the right to cross-examine those who testify against him." 1999 SD 12, ¶37, 589 NW2d 594, 602 (citing Pennsylvania v. Ritchie, 480 US 39, 51, 107 SCt 989, 998, 94 LEd2d 40 (1987)). *See also* State v. Perovich, 2001 SD 96, ¶15, 632 NW2d 12, 16 (explaining the rights guaranteed by the Confrontation Clause). We have further recognized that exposing a witness's reason or motive for testifying is not only appropriate, it also serves an extremely important constitutional function. State v. Collier, 381 NW2d 269, 272 (SD 1986) (holding State's failure to disclose evidence of an agreement with a coconspirator who testified at trial violated defendant's due process rights) (citing

Giglio v. United States, 405 US 150, 155, 92 SCt 763, 766, 31 LEd2d 104 (1974));

State v. Bogenreif, 465 NW2d 777, 782 (SD 1991) (citing Delaware v. Van Arsdall,

475 US 673, 678-79, 106 SCt 1431, 1435, 89 LEd2d 674 (1986))(additional citations

omitted).

[¶22.]     Based on the record before us, we do not believe Piper has shown the

circuit court's finding, that there was not an undisclosed agreement between the State

and Givens, was clearly erroneous.  There was no indication, first, that the State knew

anything about Givens' potential early release from the one-year term Givens was

serving, or second, that the defense was prevented from doing an effective cross-

examination.  If there was not a secret agreement for the State to disclose, then no

Confrontation Clause violation occurred.  The State knew of the plea agreement

regarding the reduction of Givens' charges from aggravated assault to simple assault,

and it provided Piper notice of this agreement.  "[T]he Confrontation Clause only

guarantees an opportunity for effective cross-examination, not cross-examination

that is effective in whatever way, and to whatever extent, the defense might wish."

*Karlen,* 1999 SD 12, ¶41, 589 NW2d at 603.  Accordingly, Piper's claims of

constitutional violations based on Givens' testimony at his sentencing hearing fail.

[¶23.]     **2.      Whether the imposition of the death penalty upon Piper
                    constituted cruel and unusual punishment.**

[¶24.]     Piper next argues the imposition of the sentence of death by lethal

injection is cruel and unusual punishment under both the South Dakota and Federal

Constitutions.  Our precedent clearly indicates that this Court does not find the death

penalty by lethal injection to be cruel and unusual under either Article VI, section 23

section 23 of our state constitution, or the Eighth Amendment of the Federal Constitution. *See Moeller I*, 1996 SD 60, 548 NW2d 465. After giving a detailed history of the death penalty, *Moeller I* goes on to state that "[t]o survive constitutional scrutiny, the death penalty: (1) must comport with contemporary standard of decency; (2) must not be excessive in light of the crime committed; and (3) must serve a legitimate penological objective." *Id.* ¶102 (citing Gregg v. Georgia, 428 US 153, 173-83, 96 SCt 2909, 2924-29, 49 LEd2d 859 (1976)). It then concludes that capital punishment meets these requirements based on public acquiescence of the punishment and the penological purpose of punishing the "most extreme crimes" and deterring capital offenders. *Id.* ¶¶106-07 (citations omitted). In *Moeller II*, we held this issue to be sufficiently resolved by our previous decisions and declined to address the issue. 2000 SD 122, ¶176 n18, 616 NW2d at 465 n18. Thus, we have clearly established in this state that the death penalty, *per se*, is not unconstitutional and see no reason to retrace our analysis here.

[¶25.]      **3.      Whether Piper's sentence of death was grossly disproportionate to other cases in South Dakota wherein the death penalty was imposed or could have been imposed.**

[¶26.]      In every case where the death penalty is imposed, this Court is required to conduct an independent review of the sentence. SDCL 23A-27A-9. We must determine:

> (1)     Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1; and
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A-27A-12; *Rhines I*, 1996 SD 55, ¶180, 548 NW2d at 454-55; *Moeller II*, 2000 SD 122, ¶163, 616 NW2d at 462-63.

[¶27.] First, we must determine whether Piper's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We have rejected Piper's due process and Confrontation Clause claims regarding the testimony of witness Givens. We cannot discern any independent basis from the record on which to invalidate Piper's sentence as the result of extenuating circumstances.

[¶28.] Next, we must determine whether the evidence supported the circuit court's finding of the alleged aggravating circumstances in Piper's case beyond a reasonable doubt. In order to be eligible for the death penalty, one of the following aggravating circumstances provided in SDCL 23A-27A-1 must be found beyond a reasonable doubt:

> (1) The offense was committed by a person with a prior record of conviction for a Class A or Class B felony, or the offense of murder was committed by a person who has a felony conviction for a crime of violence as defined in subdivision 22-1-2(9);
>
> (2) The defendant by the defendant's act knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;

(3)    *The defendant committed the offense for the benefit of the defendant or another, for the purpose of receiving money or any other thing of monetary value*;

(4)    The defendant committed the offense on a judicial officer, former judicial officer, prosecutor, or former prosecutor while such prosecutor, former prosecutor, judicial officer, or former judicial officer was engaged in the performance of such person's official duties or where a major part of the motivation for the offense came from the official actions of such judicial officer, former judicial officer, prosecutor, or former prosecutor;

(5)    The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person;

(6)    *The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.* Any murder is wantonly vile, horrible, and inhuman if the victim is less than thirteen years of age;

(7)    The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties;

(8)    The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement;

(9)    *The offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of the defendant or another*; or

(10)   The offense was committed in the course of manufacturing, distributing, or dispensing substances listed in Schedules I and II in violation of § 22-42-2.

(emphasis added); *see* SDCL 23A-27A-6. We have previously held the aggravating

factors under SDCL 23A-27A-1 to be constitutional. *Rhines I*, 1996 SD 55, ¶¶74-76,

548 NW2d at 437 (noting that the Supreme Court upheld a virtually identical statutory scheme in *Gregg*, 428 US 153, 96 SCt 2909, 49 LEd2d 859).  Additionally, we acknowledge that once aggravating circumstances have been proven beyond a reasonable doubt, the lower court has broad discretion in determining whether to sentence a particular defendant to death.  *Id.* ¶174, 548 NW2d at 454.

[¶29.]        In Piper's case, the circuit court determined the aggravating factors set forth in SDCL 23A-27A-1(3), (6), and (9), were present beyond a reasonable doubt.  First, the circuit judge found "[t]he State has proven beyond a reasonable doubt that Defendant Piper committed the offense for the benefit of himself and others, for the purpose of receiving money or other thing of monetary value," satisfying SDCL 23A-27A-1(3).  Clearly, in this case Piper and the others killed Poage in order to steal items from Poage's home, such as the PlayStation, televisions and other items.  Evidence also indicates Piper and his co-defendants killed Poage to avoid being apprehended by police.  This could easily have been inferred from Piper's statement to the police, as the entire scheme revolved around successfully stealing Poage's personal possessions.  Poage would have been the sole witness of the crimes committed, so eliminating him helped to eliminate a police messenger.  The transporting of a robbery victim to a remote area in order to accomplish his murder can hardly be understood as other than a means of destroying or hiding evidence of a crime.  Piper's statement to the police and the evidence contained in the record, including the trail of ATM withdrawals and Poage's pawned possessions, and the location and condition of the body, are more than sufficient to support the circuit

court's finding beyond a reasonable doubt that Piper's conduct demonstrated aggravating circumstances as defined by SDCL 23A-27A-1(3) and (9).

[¶30.] Next, the circuit court determined that the "State has proven beyond a reasonable doubt that this offense was outrageously or wantonly vile, that it was horrible or inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim," as provided by SDCL 23A-27A-1(6). We have already explained each of the subparts of this statutory aggravator. Depravity of mind has six definitions.

> They are that: (1) the defendant committed torture upon the living victim; (2) the defendant subjected the body of the deceased victim to mutilation or serious disfigurement; (3) the defendant relished the murder; (4) the defendant inflicted gratuitous violence upon the victim; (5) the senselessness of the crime; or (6) the helplessness of the victim.

*Rhines I*, 1996 SD 55, ¶143, 548 NW2d at 448. Torture requires: "(1) the unnecessary and wanton infliction of severe pain, agony, or anguish; and (2) the intent to inflict such pain, agony or anguish. ... '[U]nnecessary pain' implies suffering in excess of what is required to accomplish the murder." *Id.* ¶161 (citing State v. Ramseur, 524 A2d 188, 229 (NJ 1987) (citing State v. Sonnier, 402 So2d 650, 658-60 (La 1981), *cert. denied*, 463 US 1229, 103 SCt 3571, 77 LEd2d 1412 (1983))). Aggravated battery requires the "infliction of serious physical abuse upon the victim, by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof ..." and by proving specific intent to inflict unnecessary pain in excess of what was required to accomplish the murder. *Moeller II*, 2000 SD 122, ¶123, 616 NW2d at 455.

[¶31.]        The sentencing judge found that Piper acted with others, but that he was the "first physical aggressor."  In fact, at the beginning of the long series of assaults, Piper was the one who kicked Poage in the face hard enough to knock the victim unconscious before binding him.  The judge further found that Piper and his accomplices discussed the killing in front of the victim; and tortured the victim while he was still alive by forcing him to drink a toxic liquid; physically assaulted the victim; stripped the victim of his clothes; forced the victim into freezing temperatures and snow and icy water; the victim endured drowning attempts and was repeatedly kicked, stoned and stabbed over a period in excess of three hours.  Piper admitted in his statement that he even laughed and taunted the victim throughout the torture.  Piper's laughter indicates the murder involved "gratuitous violence."  Furthermore, murder in exchange for petty items like video games indicates the crime was senseless, and Poage was clearly helpless when he was naked in freezing temperatures, fighting against three individuals who appeared to be armed with a gun.  Thus, depravity of mind was clearly proven.  *See Rhines I,* 1996 SD 55, ¶143, 548 NW2d at 448.  With such gruesome facts, it takes no stretch of reasoning to conclude torture and aggravated assault as defined above were also present.

[¶32.]        SDCL 23A-27A-1 provides "the judge shall consider … any mitigating circumstances."  *See also* Lockett v. Ohio, 438 US 586, 604-05, 98 SCt 2954, 2964-65, 57 LEd2d 973 (1978) (sentencer must be allowed to consider any mitigating evidence).  The required presentencing hearing statute, SDCL 23A-27A-2, mandates "[a]t such hearing the [judge] *shall* receive all relevant evidence, including … (4) All evidence concerning any mitigating circumstances."  (emphasis added).  At the

sentencing hearing, much evidence that was intended to mitigate was provided by the defense.  Numerous affidavits acknowledged the following facts about Piper:  Piper loved camping and fishing with family and friends as a child; Piper was diagnosed with Attention Deficit and Hyperactive Disorder; Piper had problems socializing appropriately with others; Piper was a Cub Scout and Boy Scout as a child.  In addition, Piper's parents testified about Piper's good qualities, including his ability to be caring and kind.  Further, Piper apologized to the family at the hearing, stating that "I would die so you could have your son back, so you could have your brother back, because I know if someone killed my brother or my sister, or any member of my family, I-I would want them dead.  ... I'm sorry.  I'm sorry, Judge."[9]

[¶33.]        Piper argues that the court did not consider the positive aspects of pleading guilty or of his apology.  The sentencing judge acknowledged the mitigation, and said that there was "no doubt that at one time" Piper was "a good kid and a good scout."  Thus, the record demonstrates that the sentencing judge looked at both the aggravation and mitigation, and in his decision, gave credence to both.  Piper additionally blames much of the torture on the other two assailants involved, but the evidence based upon his own admissions proves his significant involvement and leadership in the torture and death of the victim.

[¶34.]        Piper also argues that because the circuit court referred to Poage by his middle name and nickname, Allan, and said, "If he is watching and listening, I don't think he will mind," the circuit judge impermissibly personalized the victim.

---

9.      For the full text of Piper's statement at his sentencing hearing, see note 25.

Furthermore, the judge stated aloud how he wondered how much "Allan" suffered in his last hours. This, Piper argues, demonstrates strong emotion and an arbitrary result. Piper also contends that the trio did not intentionally torture the victim; rather they tried to kill him quickly, but were simply unable to do so.

[¶35.] We first point out that Piper failed to cite to any authority supporting his position under this issue. Also, the record in this case does not support Piper's contention of an arbitrary result. The record demonstrates that the judge considered all aggravation and mitigation appropriately under the statutes. The aggravators were sufficiently proven when viewing the evidence in a light most favorable to upholding the verdict. *See Rhines I*, 1996 SD 55, ¶157, 548 NW2d at 451. One need go no further than Piper's own statements as to the nature of his participation in this crime. Finally, the record does not show the sentencing judge's decision was based on any passion, prejudice or irrational factors.

[¶36.] Under SDCL 23A-27A-12, on review this Court must first determine if the appropriate statutory aggravating circumstances were present and whether the sentence was imposed under passion, prejudice, or other irrational facts. Then, we must also determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." SDCL 23A-27A-12(3). Therefore, our analysis requires us to look at the proportionality of the sentence. *Id.*

[¶37.] SDCL 23A-27A-13 provides, "[t]he court shall include in its decision a reference to those similar cases which it took into consideration." This Court's previous decisions have acknowledged that our analysis of similar cases under SDCL

23A-27A-12(3) compares cases involving a capital sentencing proceeding, whether life imprisonment or a death sentence was imposed. "Because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar are those in which imposition of the death penalty was properly before the sentencing authority for determination." *Rhines I*, 1996 SD 55, ¶185, 548 NW2d at 455 (quoting Tichnell v. State, 468 A3d 1, 15-16 (Md 1983), *cert. denied*, 466 US 993, 104 SCt 2374, 80 LEd2d 846 (1984) (citing Flamer v. State, 490 A2d 104, 139 (Del 1983), *cert. denied*, 474 US 865, 106 SCt 185, 88 LEd2d 154 (1985))). With this holding, we rejected the defendant's argument that "the pool of similar cases for proportionality review should encompass all homicide cases that were prosecuted or could have been prosecuted under the State's current capital punishment scheme." *Id.* ¶184, 548 NW2d at 455. Our opinion in *Moeller II* rejected a similar argument. 2000 SD 122, ¶167, 616 NW2d at 463. Accordingly, we reject Piper's contention that the proper universe of similar cases is all convictions for Class A felonies in South Dakota.

[¶38.]     Since the 1979 enactment of South Dakota's current capital punishment scheme, thirteen capital sentencing proceedings, including Piper's and his co-defendants Page's and Hoadley's, have been conducted. In seven of those proceedings, the jury declined to impose the death penalty and sentenced the defendant to life imprisonment. Our opinion in *Rhines I* summarized six of these cases. 1996 SD 55, ¶¶187-204, 548 NW2d at 456-57; *see also Moeller II*, 2000 SD 122, ¶168, 616 NW2d 424, 463-64 (taking judicial notice of the case summaries set out in

*Rhines I*). Co-defendant Hoadley's conviction represents the seventh case. State v. Hoadley, 2002 SD 109, 651 NW2d 249. In *Rhines I*, 1996 SD 55, 548 NW2d 415; *Moeller I*, 1996 SD 60, 548 NW2d 465; and *State v. Anderson*, 2003 SD 65, 664 NW2d 48 *(Anderson II)*, the jury imposed the death sentence. We take judicial notice of the summaries of each of these cases set forth in *Rhines I*, 1996 SD 55, ¶196, 548 NW2d at 456 (summarizing *Moeller I*) and *Moeller II*, 2000 SD 122, ¶¶169-171, 616 NW2d at 464 (summarizing *Rhines, Anderson I,*[10] and *Anderson II*). We take further judicial notice of co-defendant Page's case. State v. Page, 2006 SD 2, __ NW2d __.

[¶39.] We conclude Piper's sentence of death was not disproportionate to other relevant class cases when considering the nature and extent of his criminal actions. First, we note the only other case that involved the presence of as many aggravating factors as were found in Piper's and his co-defendants' cases was in the *Rhines* case. South Dakota reenacted the death penalty in 1979. Since that time, only defendants Moeller, Rhines, and Anderson have approached the sheer brutality exhibited by Piper and his co-defendant Page, and all have received the death penalty. Piper and Page jointly planned the murder scheme and it was only after it was agreed upon between them did they so inform Hoadley and involve him it its execution. Here, Piper was consistently identified as the first defendant to physically assault Poage.

---

10. The facts supporting Anderson's death penalty sentence are reviewed in *Moeller II*, 2000 SD 122, ¶¶169-171, 616 NW2d at 464. However, due to Anderson's suicide in 2003, the full facts that resulted in his conviction for the kidnapping and murder of Larisa Dumansky, and the rape and murder of Piper Streyle are not contained in *Anderson II*, 2003 SD 65, 664 NW2d 48. Additional facts pertaining to his conviction for the kidnapping of Streyle are contained in *State v. Anderson I*, 2000 SD 45, 608 NW2d 644.

(continued . . .)

After co-defendant Page directed the victim at gun point to get on the ground, Piper kicked him in the head and knocked him unconscious. When Poage was forced to drink the concoction containing hydrochloric acid, Piper held him down with a tire iron. At the gulch, Piper kicked Poage several more times and stabbed him at least twice in the neck and once behind the ear.

[¶40.] In *Rhines I*, we recognized that "[t]he disparity in suffering endured by victims is an important and legitimate consideration when evaluating the proportionality of a death sentence." 1996 SD 55, ¶207, 548 NW2d at 458. The amount of torture Poage endured before his murder also appears to have been unprecedented in South Dakota, Piper being the direct cause of much of that torture. In the presence of a conscious Poage, Piper engaged co-defendant Page in a discussion concerning the "best" way to murder Poage, including slitting his throat. Piper also suggested to Page various ways to sharpen his knife. During the beatings at Higgins Gulch, Piper made several jokes and comments concerning the extreme amount of pain the victim must have felt, saying such things as "Ohh ... like that would suck" and "Ah, that's got to hurt." Piper told Poage he could warm up in his vehicle if he first cleaned himself in the icy cold creek, but after Poage complied, Piper refused because he did not want any blood in the vehicle. The record further shows that Piper bragged to others and relished the fact that Poage continually begged for his life throughout the ordeal. Piper's response to these repeated pleas for mercy were more stabbings, beatings and kicks to the head.

---

(. . . continued)

[¶41.] Finally, and perhaps most importantly, the circuit court identified Piper as the leader of the three co-defendants in the murder of Poage. The record demonstrates Piper's ability to direct and control Hoadley and to manipulate Page. By his own admission, Piper initiated the physical violence against Poage when he rendered him unconscious by kicking him in the head. The circuit court heard evidence that it was Piper who had first directed Page to stab the victim, and when Poage attempted escape, Piper told Page to run after him.

[¶42.] That Piper is a vicious schemer and leader is further evidenced by his actions since his imprisonment, including escape plots as well as schemes to murder prison guards and his co-defendant Page, whom he suspected of cooperating with the police against him.

[¶43.] Based upon Piper's role as instigator, and his brutalizing and torture of Poage, we conclude the imposition of the death penalty upon Piper was neither excessive nor disproportionate when compared to the applicable class of cases in South Dakota.[11]

[¶44.] **4. Whether the circuit court had jurisdiction to impose the death penalty when aggravating circumstances were not presented or alleged in an indictment or information.**

---

11. The only two sentencing options before the circuit court were life in prison without possibility of parole or death. In either case, barring executive clemency, Piper would not ever be released back into society. Thus, the issue of rehabilitation is not of major concern. "Clearly there are some acts of such a criminal magnitude that they justify a life sentence [or death] whether the perpetrator is capable of rehabilitation or not. In such instances the sentence is not disproportionate to the crime." State v. Milk, 2000 SD 28, ¶18, 607 NW2d 14, 20.

[¶45.]	In *State v. Moeller*, 2004 SD 110, 689 NW2d 1 (*Moeller III)*, we dealt with this identical issue and held that failure to allege aggravating circumstances in an indictment is not unconstitutional under *Ring v. Arizona*, 536 US 584, 122 SCt 2428, 153 LEd2d 556 (2002).  Since our holding in *Moeller III*, other state courts have likewise concluded that aggravating factors need not be pleaded in a state indictment. *See* Bustamonte v. Wall, 866 A2d 516, 522-23 (RI 2005) (holding no constitutional requirement that aggravating factors be set forth in grand jury indictment); McKaney v. Foreman ex rel County of Maricopa, 100 P3d 18, 22 (AZ 2004) (no requirement that aggravating factors be pleaded in indictment).  As in *Moeller III*, the State's formal notice of aggravating factors here provided sufficient notice to Piper under both our Federal and State Constitutions.[12]

[¶46.]	**5.	Whether South Dakota's capital sentencing scheme in nonjury trials violates the Sixth Amendment right to a jury trial as incorporated to the states through the Fourteenth Amendment.**

[¶47.]	Having rejected Piper's first claim based upon *Ring*, we now turn to his contention that the death penalty was unconstitutionally imposed in his case because the circuit court, rather than a jury, made the findings that the aggravated

---

12.	On June 22, 2000, the State filed a "Notice of Intent to Seek Death Penalty" in Piper's case for the murder of Poage.  On September 5, 2000, the State provided "Notice of Aggravating Circumstances," which specified the death penalty was being sought based upon the aggravating factors found in SDCL 23A-27A-1(3), (6), and (9).

circumstances alleged by the State were present beyond a reasonable doubt.[13] Specifically, Piper believes that SDCL chapter 23A-27A is unconstitutional because it does not provide defendants who plead guilty to a capital offense with an opportunity to have the aggravating circumstances found by a jury as opposed to a judge. Although in this case the circuit court offered Piper the opportunity to have a sentencing hearing in front of a jury, an option which Piper expressly waived, Piper argues the circuit court did not possess the authority under South Dakota law to accept his waiver.

[¶48.] We agree with Piper's argument that under *Ring*, a capital sentencing scheme would be unconstitutional if it prevented a defendant who pleaded guilty from having alleged aggravating circumstances found by a jury. *See Ring,* 536 US at 609, 122 SCt at 2443, 153 LEd2d 556. We do not believe, however, that there is any statutory impediment preventing a defendant who pleads guilty in South Dakota state court from exercising his right to a jury at the sentencing phase.

[¶49.] The South Dakota sentencing scheme involves two procedural statutes: SDCL 23A-27A-2 and SDCL 23A-27A-6. SDCL 23A-27A-2, which governs the procedure to be followed in capital cases where a jury makes the sentencing determination, requires the court to conduct a presentencing hearing before a jury. SDCL 23A-27A-2 provides:

---

13. The analysis of this issue is based upon this Court's analysis of the same issue raised in *Moeller III*, 2004 SD 110, 689 NW2d 1. Given the seriousness of the penalty in this case, we re-state the *Moeller III* analysis as applicable herein. *See also Page,* 2006 SD 2, ¶¶69-91, ___ NW2d at ___-___.

In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing the jury shall receive all relevant evidence, including:

    (1)    Evidence supporting any of the aggravating circumstances listed under § 23A-27A-1;

    (2)    Testimony regarding the impact of the crime on the victim's family;

    (3)    Any prior criminal or juvenile record of the defendant and such information about the defendant's characteristics, the defendant's financial condition, and the circumstances of the defendant's behavior as may be helpful in imposing sentence;

    (4)    All evidence concerning any mitigating circumstances.

SDCL 23A-27A-6, which governs the procedure to be followed in capital cases where a jury trial is waived and the court makes the sentencing determination, provides:

In nonjury cases the judge shall, *after conducting the presentence hearing as provided in § 23A-27A-2*, designate, in writing, the aggravating circumstance or circumstances, if any, which he found beyond a reasonable doubt. Unless at least one of the statutory aggravating circumstances enumerated in § 23A-27A-1 is so found, the death penalty shall not be imposed.

(emphasis added).

[¶50.]      We have long recognized the general rule that "[w]hen interpreting a statute we presume the Legislature intended to enact a valid statute, and where 'a statute can be construed so as not to violate the constitution,' we will adopt such a construction." *Martin*, 2003 SD 153, ¶26, 674 NW2d at 300 (quoting State v. Allison, 2000 SD 21, ¶25, 607 NW2d 1, 2 (citation omitted)). Therefore, we interpret SDCL 23A-27A-2 and SDCL chapter 23A-27 in general as providing for a sentencing

hearing wherein a jury will determine the presence or absence of alleged aggravating factors when a defendant pleads guilty to a capital offense. We must reject as unconstitutional any reading of SDCL chapter 23A-27A that would *prevent* a capital defendant from having the opportunity to have a sentencing hearing before a jury.

[¶51.] The statutory scheme in SDCL chapter 23A-27A regulates the sentencing *procedure*. An examination of all relevant statutes reflects that SDCL 23A-27A-2 and 6 do not purport to regulate the *right* to jury sentencing in capital cases. There is certainly *no* language in either statute that clearly, or otherwise, states that the jury hearing on aggravating circumstances is inapplicable in nonjury cases when a defendant has pleaded guilty as Piper claims. Instead, a correct reading reflects that the statutes simply do not speak to the subject of the *right* to jury sentencing. Indeed, the purpose of SDCL 23A-27A-2 is to describe the procedure to be followed in cases "which *are tried by a jury*," and SDCL 23A-27A-6 describes the procedure to be followed in "*nonjury* cases." (emphasis added.) This emphasized language, cases "which *are tried* by a jury" and "*nonjury cases*," demonstrates that these statutes do not purport to "prevent" the right of jury sentencing. Rather, this emphasized language demonstrates that the statutes presume that the *right* to jury trial has been determined elsewhere.

[¶52.] Therefore, the South Dakota statutes are unlike the Arizona statutes that were invalidated in *Ring*, 536 US 584, 122 SCt 2428, 153 LEd2d 556. The *Ring* statutes expressly governed the *right* to jury sentencing because they explicitly provided that *only a judge* could consider the aggravating circumstances and impose

a death sentence.[14]  *Id.* at 592, 122 SCt at 2434, 153 LEd2d 556.  In contrast, the

South Dakota statutes are simply silent on the subject of the right to jury sentencing.

This silence is hardly surprising because most provisions in our criminal code fail to

expressly grant or deny the right to a jury trial.  Rather, the code provisions leave it

to the state and federal constitutions and specific implementing statutes to regulate

the right to a jury trial.

[¶53.]        The state and federal constitutions provide the foundation for South

Dakota's jury implementing statutes.  The Sixth Amendment to the

United States Constitution guarantees the right to a jury trial in capital cases

without qualification.[15]  Article VI, section 6 and section 7 of the South Dakota

Constitution also grant that right.  The South Dakota language provides:

> The right of trial by jury shall remain inviolate and shall extend
> to all cases at law without regard to the amount in controversy[.]
> [§ 6].
>
> In all criminal prosecutions the accused shall have the right ... to
> a speedy public trial by an impartial jury of the county or district
> in which the offense is alleged to have been committed.  [§ 7].

---

14.   The Arizona statutes stated:  "[t]he hearing shall be conducted *before the court alone.  The court alone* shall make all factual determinations required by this section or the constitution of the United States or this state."  *Ring*, 536 US at 592, 122 SCt at 2434, 153 LEd2d 556 (emphasis added) (quoting ArizRevStat Ann § 13-703(C)(2001), *amended by* 2002 Ariz Sess Laws, 5th Spec Sess, ch1, § 1).

15.   "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed... ."  US Const amend. VI.

"The obvious purpose of these [c]onstitutional provisions is to *guarantee* an accused the right to trial by jury. It is a right [that] cannot be denied or withheld by the state." State v. Thwing, 84 SD 391, 394, 172 NW2d 277, 278 (1969) (emphasis added). And, the scope of the right is broad. It extends to all cases "where such right existed at common law." *See* State v. Mitchell, 3 SD 223, 226, 52 NW 1052, 1052 (1892). Because the right of jury trial in capital cases existed under the common law at the time our Constitution was adopted, there is no dispute that the South Dakota Constitution guarantees that right in capital cases today. *See* 1887 South Dakota Terr Compiled Laws §§ 7322-7336, 7484, 7489; McCall v. United States, 1 Dak 320, 46 NW 608 (Dakota Terr 1876).

[¶54.]     This constitutional guarantee has been implemented by two statutes. The first, SDCL 23A-18-1 (Rule 23(a)), affords the *right* to jury trial in *all* cases contemplated by the constitution. The statute provides that: "[c]ases *required to be tried* by a jury *shall be so tried* unless the defendant waives a jury trial in writing or orally on the record with the approval of the court and the consent of the prosecuting attorney." *Id.* (emphasis added). Because it is well settled that both the guilt and sentencing phases of capital cases *are required to be tried by a jury,*[16] SDCL 23A-18-1 implements the constitutional guarantee and affirmatively directs that a jury *shall*

---

16.    *See Ring*, 536 US at 609, 122 SCt at 2443, 153 LEd2d 556 (observing that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.").

be utilized.  Thus, even if SDCL 23A-27A-2 and 23A-27A-6 fail to explicitly afford the right of jury sentencing, SDCL 23A-18-1 cures the alleged omission.

[¶55.]     The second statute, SDCL 23A-45-13, further authorized the circuit court's offer of a jury sentencing in this case.  In analyzing SDCL 23A-45-13, it must be reiterated that SDCL 23A-27A-2 and 23A-27A-6 are procedural statutes that do not expressly speak to the *right* of jury trial.  Therefore, in cases like this where there is no statutory *prohibition* on the procedural right to a jury, SDCL 23A-45-13 authorizes the trial court to proceed "in any lawful manner."[17]  It states "[i]f no procedure is specifically prescribed by statute or rule, a court may proceed in any lawful manner not inconsistent with this title or with any other applicable statute." *Id.*

---

17.     There is no dispute that the *Ring* right of sentencing by jury is a matter of procedure.  The United States Supreme Court so held, explaining:

> A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes.  *See Bousley* [*v. United States*]*, supra,*[523 US 614] at 620-621, 118 SCt 1604[, 1620-1621, 140 LEd2d 828] (rule "hold[s] that a ... statute does not reach certain conduct" or "make[s] conduct criminal"); *Saffle*[ v. Parks, 494 US 484, 495, 110 SCt 1257, 108 LEd2d 415 (1990)] (rule "decriminalize[s] a class of conduct [or] prohibit[s] the imposition of ... punishment on a particular class of persons").  In contrast, rules that regulate only the *manner of determining* the defendant's culpability are procedural.  *See Bousley* at 620, 118 SCt 1604 [140 LEd2d 828].

Schriro v. Summerlin, 542 US 348, 353, 124 SCt 2519, 2523, 159 LEd2d 442 (2004).  *Schriro* went on to hold that "judged by this standard," the *Ring* right to have a jury determine aggravating circumstances in imposing the death penalty "is properly classified as procedural."  *Id.*

[¶56.]        Thus, even if we were to accept Piper's offered construction that SDCL chapter 23A-27A does not authorize jury sentencing in capital cases following a guilty plea, other statutes provide that right.  SDCL 23A-45-13 fills the void by authorizing a trial court to "proceed in any lawful manner."  And, SDCL 23A-18-1 not only authorized, but *required* the circuit court to offer a jury hearing and sentencing.  As this Court has previously noted, trial courts must use this latter statute to properly guarantee a defendant's constitutional rights and to "provide an effective manner to try the case."  State v. Goodman, 384 NW2d 677, 680 (SD 1986).

[¶57.]        In this case, however, Piper specifically asked to be sentenced by the circuit court, thereby waiving his constitutional right to have a jury determine whether the alleged aggravating circumstances in his case existed beyond a reasonable doubt.  "Even fundamental rights can be waived."  State v. Garber, 2004 SD 2, ¶25, 674 NW2d 320, 327 (quoting State v. Henjum, 1996 SD 7, ¶13, 542 NW2d 760, 763 (citation omitted)).  The circuit court properly presented Piper with the option of exercising his right to sentencing by a jury as provided by South Dakota's capital punishment statutory scheme.

[¶58.]        Now on appeal, dissatisfied with his choice, Piper asks this Court to invalidate his voluntary waiver of a jury sentencing.  Piper argues that, even though he did not want a jury sentencing, *if he would have wanted one* that sentencing would have been unavailable.  Piper contends that the circuit court had no authority to offer jury sentencing, and therefore, the circuit judge's offer of jury sentencing was "illusory."  In circular reasoning, Piper concludes that such an illusory offer is insufficient to overcome an unconstitutionally imposed death sentence.

[¶59.] Piper is mistaken in three respects. First, as was explained above, the circuit court was authorized to offer a jury hearing at the sentencing phase of this capital case. Even assuming that the circuit court had no specific authority to offer a jury sentencing under the capital sentencing statutes, SDCL 23A-18-1 and 23A-45-13 explicitly authorized, and in fact required, use of a jury unless waived. Thus, the circuit court's offer was not illusory.

[¶60.] Second, even if one were to assume that there was no statutory authority to offer jury sentencing, the waiver was still valid because the *Ring* analysis is inapplicable when a defendant waives the right to jury sentencing. While Piper offers absolutely no authority for his contrary conclusion, all courts that have considered the issue uphold such waivers. The courts recognize that the *Ring* analysis is inapplicable because the defendant in *Ring* pleaded not guilty and went to trial, but was deprived of jury sentencing. Because *Ring* is limited to cases where a defendant is deprived of a *requested* jury sentencing, the authorities hold that guilty pleas and waivers are valid even if the underlying sentencing scheme explicitly and unequivocally precludes the defendant from receiving a jury sentence. Colwell v. State, 59 P3d 463 (Nev 2002); Moore v. State, 771 NE2d 46 (Ind 1002).

[¶61.] For example, in *Colwell*, 59 P3d 463, the Nevada Supreme Court considered this issue and concluded that "*Ring* is not applicable to [a defendant's] case [when], unlike *Ring*, [the defendant pleads] guilty and waive[s] his right to a jury trial." *Id.* at 473. The Nevada Supreme Court reached that conclusion even though

though the Nevada statutory framework, like Arizona's,[18] unequivocally *eliminated* the right to a jury at sentencing.[19]  *Id.*  Nevertheless, *Colwell* distinguished *Ring* because Ring pleaded not guilty and went to trial, unlike Colwell who pleaded guilty and waived his right to a jury trial.  *Id.*  *Colwell* ultimately observed that because the Supreme Court "has held that the valid entry of a guilty plea in a state criminal court involves the waiver of several federal constitutional rights[, a]mong these … 'the right to trial by jury'[,] Colwell's guilty plea included an express waiver of his right to a jury trial and was valid."  *Id.* at 474 (citing Boykin v. Alabama, 395 US 238, 243, 89 SCt 1709, 1712, 23 LEd2d 274 (1969)).

[¶62.]     The Indiana Supreme Court reached the same conclusion in *Moore,* 771 NE2d at 49.  In *Moore,* the Indiana statutes, like those in Nevada, unequivocally, and unconstitutionally, foreclosed any possibility of a right to jury sentencing following a plea of guilty.[20]  Nevertheless, the Indiana Supreme Court

---

18.   *Colwell* described the Arizona sentencing scheme that was overturned in *Ring* as one in which, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty."  59 P3d at 469.

19.   The Nevada statute provided "that when a defendant pleads guilty to first degree murder and the State seeks a death sentence, a panel of three district judges must 'conduct the required penalty hearing to determine the presence of aggravating and mitigating circumstances, and give sentence accordingly.'"  *Id.* at 469 n60 (citing NevRevStat § 175.558, *repealed by* 2003 Nev Laws, c366, § 8).

20.   "At the time of the offense, the statute, Indiana Code § 35-50-2-9 (Supp 1979), provided in relevant part, 'If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the

(continued . . .)

concluded that the defendant's voluntary plea of guilty to three counts of murder waived his entitlement to argue that the "Indiana capital sentencing statute violated the federal and state constitutions by depriving him of a jury determination of the aggravating circumstances that made him eligible for the death sentence." *Id.* *Moore* observed that because the defendant knew that his guilty plea would deprive him of access to a jury, he had forfeited his right to "have a jury recommend to the trial court whether or not a death penalty should be imposed against" the defendant. *Id.*

[¶63.] It must be further observed that Piper's waiver is also valid under United States Supreme Court authority and a prior decision of this Court. The United States Supreme Court has long held that a waiver of the right to a jury is valid even though the underlying right waived does not exist. *See* Patton v. United States, 281 US 276, 50 SCt 253, 74 LEd 854 (1930) (waiving the right to a jury composed of twelve persons) (*abrogated on other grounds by* Williams v. Florida, 399 US 78, 90 SCt 1893, 26 LEd2d 446 (1970)). Similarly, in *Thwing*, 84 SD 391, 172 NW2d 277, this Court upheld waiver of a right to a jury trial even though the underlying right, an alleged right to a court trial, did not exist. This Court did so because "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Id.* at 395-96, 172 NW2d at 279 (quoting Singer v. United States, 380 US 24, 85 SCt 783, 13 LEd2d 630 (1965)).

---

(. . . continued)
court, or *the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing.'" Moore*, 771 NE2d at 49 (emphasis in
(continued . . .)

[¶64.] As was previously pointed out, the law is quite settled that even assuming Piper had no statutory right to a jury hearing at sentencing, his decision to waive that "nonexistent" statutory right and proceed with sentencing before the circuit court was a valid waiver of his constitutional right to jury sentencing. *See Colwell,* 59 P3d 463; *Moore*, 771 NE2d 46. *See also* Sanchez v. Superior Court, 126 CalRptr2d 200, 206 (CalCtApp 2002) (holding that after *Ring,* a defendant may validly waive his or her right to have the jury determine the degree of murder); People v. Jackson, 769 NE2d 21, 27 (Ill 2002) (stating that "[e]very fact necessary to establish the range within which a defendant may be sentenced is an element of the crime and thus falls within the constitutional rights of a jury trial and proof beyond a reasonable doubt, made applicable to the states by the due process clause of the fourteenth amendment. But by pleading guilty, a defendant *waives exactly those rights."*); People v. Chandler, 748 NE2d 685, 690 (IllAppCt 2001) (stating that "[h]aving waived a jury trial on all issues, defendant cannot now claim that he was deprived of the right to have a jury determine the issue of his future dangerousness."); State v. Edwards, 810 A2d 226, 234 (RI 2002) (holding that "[b]y waiving a jury, defendant accepted the procedure as followed in this case, that the trial justice, after finding him guilty of the offense of first-degree domestic murder, would proceed to find, as she did, that the aggravating circumstance of torture and aggravated battery had been proven beyond a reasonable doubt.").

---

(. . . continued)
     original).

[¶65.] It must also be observed that Piper's argument against following settled waiver jurisprudence, would shift to a capital defendant the exclusive right to control the sentence he or she receives. In order to control the sentence, a defendant need merely waive the right to jury, or presumably some other constitutional right, at sentencing. Should the defendant not receive the life sentence requested from the trial court, he or she then need only appeal arguing a denial of the constitutional right that he or she had expressly waived. *See* People v. Rhoades, 753 NE2d 537, 544 (IllAppCt 2001). Because the reasoning advanced by Piper requires the invalidation of sentences when this appellate argument is made, and because a life sentence must be imposed under SDCL 23A-27A-14 whenever a death sentence is invalidated by this Court, the procedural maneuvering sanctioned would guarantee a capital defendant the absolute right to obtain a life sentence. The Legislature could not have intended such an absurd result in enacting SDCL 23A-27A-2, 6, and 14.

[¶66.] It must be finally noted that Piper's third and final argument on this issue is based upon a hypothetical that he *might have* asked for jury sentencing. However, Piper lacks standing to assert the invalidity of his waiver based upon a hypothetical. Because Piper waived the right to jury sentencing, he may not now argue that the statutes are unconstitutional as applied to him or someone else who *might have* requested a jury sentence. As the Supreme Court has explained:

> [a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing

to argue that it would be unconstitutional if applied to third parties in hypothetical situations.[21]

County Court of Ulster County, N.Y. v. Allen, 442 US 140, 154-155, 99 SCt 2213, 2223, 60 LEd2d 777, 790 (1979) (citing Broadrick v. Oklahoma, 413 US 601, 610, 93 SCt 2908, 2914, 37 LEd2d 830 (1973)).[22]  This Court has also rejected such claims based on hypotheticals.  "Judicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote."  Gottschalk v. Hegg, 89 SD 89, 95, 228 NW2d 640, 643-644 (1975) (citation omitted).  Therefore, in determining the constitutionality of statutes, "'the mere fact that there might be a case[,] where to apply the provisions of [the statute] would result in [a constitutional violation,] does not render the [statute] unconstitutional, but merely prevents its application in such a case.'"  City of Pierre

---

21.  "A limited exception has been recognized for statutes that broadly prohibit speech protected by the First Amendment.  This exception has been justified by the overriding interest in removing illegal deterrents to the exercise of the right of free speech."  *Allen*, 442 US at 155, 99 SCt at 2223, 60 LEd2d 777 (internal citation omitted).

22.  In *Broadrick*, 413 US at 610-611, 93 SCt at 2915, 37 LEd2d 830, the United States Supreme Court explained why hypothetical challenges are not allowed:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.  A closely related principle is that constitutional rights are personal and may not be asserted vicariously.  These principles rest on more than the fussiness of judges.  They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.
>
> (continued . . .)

v. Russell, 89 SD 70, 73, 228 NW2d 338, 341 (1975) (quoting Clark Implement Co. v. Wadden, 34 SD 550, 556-57, 149 NW 424, 426 (1914)). Piper fails to acknowledge that although he has construed the capital sentencing scheme in such a way that it *could be applied* to violate the Sixth Amendment right to jury, *it was not so applied* in this case.

[¶67.]     In summary, Piper argues that the South Dakota capital sentencing statutes are unconstitutional, believing that they "prevent" the right of jury trial at sentencing. However, Piper fails to consider two relevant South Dakota statutes that provide for that right. Additionally, even if the right of jury trial is not allowed under the statutes, Piper's argument on waiver is not only unsupported, but is

refuted by the United States Supreme Court, this Court, and the other State Supreme Courts that have considered this issue.

[¶68.]     Piper, by pleading guilty and expressly declining the circuit court's offer to empanel a jury to consider his sentence, waived his right to challenge the jury sentencing scheme. Therefore, even if we read the capital sentencing statutes as failing to specifically mention the right of jury sentencing following a plea, in fact, even if we read them to explicitly "prevent" such jury sentencing, Piper voluntarily waived that right. Waivers are no stranger to our criminal procedure jurisprudence. We will not, without any supporting authority, sanction the remarkable proposition that a defendant may waive the right to a jury at sentencing, allow the trial court to

---

(. . . continued)

        (internal citations omitted.)

impose a sentence in accordance with the defendant's wishes, and then, to avoid an unfavorable sentence, invalidate the waiver on appeal by arguing a deprivation of the constitutional right that the defendant *did not want to exercise. See Rhoades*, 753 NE2d at 544 (stating that a "[d]efendant should not be able to waive a right, receive a sentence he subjected himself to, and then contend that the right was violated."). This reasoning is illogical. More fundamentally, it is at odds with cases from this Court, the United States Supreme Court, and other state Supreme Courts.

[¶69.] **6. Whether Piper's sentence of death was grossly disproportionate to co-defendant Hoadley's sentence of life imprisonment without the possibility of parole.**

[¶70.] For the final issue on appeal, Piper asks this Court to overturn his death sentence as grossly disproportionate in light of co-defendant Hoadley's sentence of life imprisonment. After Hoadley was sentenced to life imprisonment, we remanded Piper's first appeal to the circuit court for an intra-case proportionality review as articulated by our opinion in *State v. Bonner*, 1998 SD 30, 577 NW2d 575. *See Hoadley*, 2002 SD 109, 651 NW2d 249 (affirming co-defendant Hoadley's life sentence without the possibility of parole). On remand, the circuit court held a hearing and subsequently entered extensive findings of fact and conclusions of law affirming Piper's death sentence. Piper goes beyond Eighth Amendment proportionality analysis and addresses our statutory review under SDCL chapter 23A-27A and its interpretative case law in a comparison of the culpability of himself and Hoadley. Since both statutory and constitutional reviews are invoked, we will address each.

[¶71.] Our proportionality review as set out in *Bonner,* 1998 SD 30, 577 NW2d 575, is derived from the Eighth Amendment's prohibition against cruel and unusual punishment. In this case, Piper claims his death sentence was unconstitutionally imposed because his co-defendant Hoadley received a sentence of life imprisonment. As we recognized in *Bonner*:

> [I]f the words "Equal Justice Under Law" call for more than just a lofty inscription, then our vigilance ought to be aroused when extremely divergent sentences are imposed for the same offense. Gross disparity in punishment erodes public confidence in our institutions of justice. ... Of course, equal treatment in sentencing does not mean senseless uniformity, *but when a sentence is so out of proportion to the offense and so different from what others have received for the same conduct, then decency and conscious urge us to examine it more closely.*

1998 SD 30, ¶12, 577 NW2d at 578-79 (emphasis added) (internal citation omitted). Thus, our task is to determine if Piper and Hoadley were sentenced for the same conduct, and if so, whether the divergent sentences imposed upon them resulted in gross disparity in punishment.

[¶72.] Since our opinion in *Bonner*, we have employed the following well-established principles in reviewing the proportionality of a given sentence:

> [T]o assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends. If, on the other hand, the sentence appears grossly disproportionate, we may, in addition to examining the other *Solem* factors, conduct an intra- and inter-jurisdictional analysis to aid our comparison or remand to the circuit court to conduct such comparison before resentencing. We may also consider other relevant factors, such as the effect upon society of this type of offense.

*Id.* ¶17 (citing *Harmelin v. Michigan,* 501 US 957, 1000, 111 SCt 2680, 2704, 115 LEd2d 836 (1991)).

[¶73.]      The Legislature sanctioned capital punishment for murder when at least one aggravating circumstance exists.  SDCL 23A-27A-1.  In Piper's case, the circuit court found five aggravating circumstances.[23]  As discussed above, the sentencing judge had ample factual justification for determining those aggravators were present in this case.

[¶74.]      Piper pleaded guilty to first degree felony murder, kidnapping, first degree robbery, first degree burglary, and grand theft.  His first degree murder conviction constituted a Class A felony carrying with it the maximum penalty of death.  Piper waived his right to sentencing by jury and instead actively sought sentencing by the circuit court.  His co-defendant Hoadley pleaded not guilty but was convicted by a jury of the same offenses to which Piper pleaded guilty.  Hoadley, however, also sought sentencing by a jury.  The jury found the same aggravating factors present in Hoadley's case as the circuit court found in Piper's case:  SDCL 23A-27A-1(3), (6), and (9).  After hearing the relevant evidence in mitigation and aggravation, the jury decided to impose life imprisonment upon Hoadley rather than

---

23.    The circuit court found that five aggravating circumstances had been proven beyond a reasonable doubt by the State.  Three aggravators were proven under SDCL 23A-27A-1(6), in that the offense included torture, depravity of mind and aggravated battery to the victim.  The fourth aggravator was proven under SDCL 23A-27A-1(3), in that circuit court found beyond a reasonable doubt that the offense was committed for the pecuniary benefit of the defendant and co-defendants.  The fifth aggravator was proven under 23A-27A-1(9), in that the offense was committed in order to eliminate Poage as a witness.

the death penalty. For his proportionality argument, Piper primarily relies on the fact that Hoadley was convicted of the same crimes to which he pleaded guilty and the fact that the jury found the same aggravating factors in Hoadley's case as the circuit court determined were present in his case.

[¶75.]     Initially, we note this Court's statement in *Bonner* that "[r]arely will disparity be so immediate, when accomplices sentenced for the same offense receive diametrically opposite punishments." 1998 SD 30, ¶18, 577 NW2d at 580. We further recognize "death is a different kind of punishment from any other which may be imposed in this country" and that "[t]he penalty of death is qualitatively different from a sentence of imprisonment, however long." Lankford v. Idaho, 500 US 110, 125 n21, 111 SCt 1723 n21, 1732, 114 LEd2d 173 (1991) (citing Gardner v. Florida, 430 US 349, 357, 97 SCt 1197, 1204, 51 LEd2d 393 (1977) and Woodson v. North Carolina, 428 US 280, 305, 96 SCt 2978, 2991, 49 LEd2d 944 (1976)). This qualitative difference between Piper's death sentence and Hoadley's life sentence does not render the sentences *per se* disproportionate. In order for his sentence to be disparate under our *Bonner* analysis, Piper must first show his and Hoadley's "past records, demeanor, [and] *degree of criminal involvement* ... are sufficiently similar as to cause the sentence disparity between them to be unjust." *See Garber*, 2004 SD 2, ¶32, 674 NW2d at 328 (citing *Bonner*, 1998 SD 30, ¶20, 577 NW2d at 581) (emphasis added)). Absent such a showing, we will not reverse the circuit court's sentencing decision because disparate treatment of co-defendants is permissible where one of the defendants is more culpable than a co-defendant. *Id.* ¶33.

[¶76.]    Although the Supreme Court has addressed cases where one co-defendant received the death penalty while another did not, it has never held that all co-defendants convicted for the same capital offense must receive the same sentence. *See* Enmund v. Florida, 458 US 782, 102 SCt 3368, 73 LEd2d 1140 (1982); Tison v. Arizona, 481 US 137, 107 SCt 1676, 95 LEd2d 127 (1987).  Research has not revealed any state supreme court that has so held, nor was Piper able to cite to such authority in his briefs to this Court.  Indeed, the majority of states have explicitly held the opposite after concluding it was constitutionally permissible for one co-defendant to receive the death penalty while another receives a less severe sentence.  *See* Gavin v. State, 891 So2d 907 (AlaCrimApp 2003) ("There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence.") (affirming death sentence despite dismissal of capital charges against co-defendant) (quoting Williams v. State, 461 So2d 834, 839 (AlaCrimApp 1983), *rev'd on other grounds*, 461 So2d 852 (Ala 1984)); Taylor v. State, 808 So2d 1148, 1201 (AlaCrimApp 2000) ("[W]hile our statute obliges us to consider the punishment given any accomplices, it does not require that every defendant involved in a crime receive the same punishment.") (affirming capital sentence despite life sentence of co-defendant) (quoting McNair v. State, 706 So2d 828, 845 (AlaCrimApp 1997)); State v. Taylor, 838 So2d 729, 757 (La 2003) ("As a general rule, the fact a co-defendant has received a more lenient sentence does not necessarily indicate the [death] penalty imposed on defendant is excessive.") (affirming death sentence even though co-defendant sentenced to life for the same murder in subsequent trial) (citing State v. Day, 414 So2d 349, 352 (La 1982)); State v. Jaynes, 549 SE2d 179, 230 (NC 2001)

v. Jaynes, 549 SE2d 179, 230 (NC 2001) ("[T]he fact that a defendant is sentenced to death while a co-defendant receives a life sentence for the same crime is not determinative of proportionality.") (affirming capital sentence where co-defendant received sentence of life-imprisonment) (quoting State v. McNeill, 509 SE2d 415, 427 (NC 1998)); State v. Morris, 24 SW3d 788, 800 (Tenn 2000) ("Similarly, that a defendant in a similar case or even the same case has received a sentence less than death does not render a death sentence arbitrary, excessive, or disproportionate.") (citing State v. Cauthern, 967 SW2d 726, 741 (Tenn 1998) (affirming death penalty)).

[¶77.] The above-cited cases are consistent with the general proposition recognized in the noncapital *Garber* opinion, 2004 SD 2, ¶33, 674 NW2d 320, 328, that held the level of culpability for an offense is not always the same, even where a defendant has pleaded guilty to the same offense. Today, we hold this general proposition as applicable to our review of capital sentencing cases as well as noncapital cases.

[¶78.] Having determined there is no *per se* rule that all co-defendants convicted of the same capital offense must receive the same sentence, we next examine the acceptable ways in which co-defendants may be distinguished from each other. The Supreme Court has twice addressed situations where multiple co-defendants were convicted of the same capital offense. In *Enmund*, 458 US 782, 102 SCt 3368, 73 LEd2d 1140, the Supreme Court reversed the death sentence of a defendant who was present in the getaway car used in an armed robbery that resulted

resulted in two murders.  The defendant, Enmund, received the death penalty along with the co-defendant who actually committed the murders.  The Supreme Court reversed:

> Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

*Id.* at 801, 102 SCt at 3378-79, 73 LEd2d 1140.  Therefore, under *Enmund*, an accomplice to a felony may not be sentenced to death unless he either killed or intended a killing to occur:  "For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt." *Id.*  In sum, a defendant's capital sentence must be based upon his own culpability in a murder and not upon his co-defendant's actions.

[¶79.]    The Supreme Court clarified its holding in *Tison*, wherein the Court affirmed the capital sentence of two appellants who had helped two convicted murderers escape from an Arizona penitentiary.  481 US 137, 107 SCt 1676, 95 LEd2d 127.  During the escape, the appellants watched while the two escaped convicts murdered a family of four that had pulled over to help the men with a flat tire.  *Id.* at 141, 107 SCt at 1679, 95 LEd2d 127.  Upholding the death sentences of the two appellants, the *Tison* Court ruled:

> [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital

> sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

481 US at 157-58, 107 SCt at 1688, 95 LEd2d 127. This holding was based on the Court's reasoning that the *Enmund* culpability requirement may be established through "major participation in the felony committed, combined with reckless indifference to human life." *Id.* Thus, under *Enmund* and *Tison*, a defendant's death sentence must be rooted in his own culpability for the capital offense, as demonstrated by his actual killing, intent or knowledge that killing would occur, or through major participation in a crime involving reckless indifference to human life.

[¶80.] Accordingly, in reviewing situations where multiple defendants were involved in the commission of a capital offense, state courts have focused upon the relative culpability of the particular defendant. The Florida Supreme Court has stated that "[u]nderlying our relative culpability analysis is the principle that equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment." Shere v. Moore, 830 So2d 56, 60 (Fla 2002) (citations omitted). However, "[w]here coperpetrators are not equally culpable; the death sentence of the more culpable defendant is not disproportionate where the other receives a life sentence." Caballero v. State, 851 So2d 655, 663 (Fla 2003) (citing Jennings v. State, 718 So2d 144, 153 (Fla 1998)). Generally, in determining the relative culpability of an appellant, state courts seek to distinguish between those co-defendants who were "active participants" in the crime from those who were only "passive participants." People v. Caballero, 794 NE2d 251, 269-71 (Ill 2002) ("[E]vidence that defendant was a follower, rather than a leader, in the commission of the crime has been held to be a

the crime has been held to be a significant factor in the analysis of disparate sentences.") (citing People v. Jackson, 582 NE2d 125 (Ill 1991) (citing People v. Gleckler, 411 NE2d 849 (Ill 1980))). A*ccord* Kormondy v. State, 845 So2d 41, 47-48 (Fla 2003) (upholding capital sentence where defendant was the "dominant force in the killing" and the "triggerman"); Marquard v. State, 850 So2d 417, 424 (Fla 2002) (affirming death penalty where facts tended to show the defendant was the "dominant person in this entire course of events" including driving the group to a secluded area and ordering another co-defendant to stab the victim); *Taylor*, 838 So2d at 757 (recognizing that capital sentences are "invariably returned by juries when defendant was the shooter"); Simmons v. State, 869 So2d 995, 1007-08 (Miss 2004) (upholding death penalty where defendant "actively planned and participated" in a robbery and murder even though he was not the leader, planner, or instigator of the killing); *Cauthern*, 967 SW2d at 741 (affirming capital sentence where defendant could be characterized as "the leader in the perpetration of this crime; he knew the victims and planned the offenses"); State v. Lafferty, 20 P3d 342, 375 (Utah 2001) (death sentence upheld where defendant was the "principle actor" who had "masterminded the scheme" that resulted in the deaths); Harlow v. State, 70 P3d 179, 203-04 (Wyo 2003) (utilizing the language of *Tison* in upholding the death sentence for a defendant who was a "major participant in a murder" and "acted with reckless indifference to human life").

[¶81.]     Having determined that the proportionality of co-defendants' disparate sentences should be grounded in the difference in their relative culpability for the crime, we must address the nature of the evidence upon which this determination

may be based. In *Lafferty*, 20 P3d at 375, the Supreme Court of Utah spoke in terms of "ample" evidence and "clear weight of the evidence" in determining that the defendant's culpability in the crime was not disproportionate to his death sentence. In *Cauthern*, the Tennessee Supreme Court detailed the facts of the case and concluded that "sufficient evidence" existed on which to base disparate sentences of co-defendants convicted of the same felony. 967 SW2d at 741. In a recent opinion, the Court of Criminal Appeals of Alabama upheld a defendant's capital sentence conviction based largely upon the testimony of one of his accomplices. *Gavin*, 891 So2d at 975-77. In that case, the court found the accomplice's testimony to be "sufficiently corroborated" by the evidence in the case. *Id.*

[¶82.] With these recent decisions in mind, it appears that most state supreme courts are deferential to the facts as established by the finder of fact, whether it be a jury or trial court. According to the Florida Supreme Court: "a trial court's determination concerning the relative culpability of the co-perpetrators in a first degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence." *Marquard*, 850 So2d at 424 (quoting Puccio v. State, 701 So2d 858, 860 (Fla 1997)).

[¶83.] SDCL 23A-27A-10 provides that this Court shall render its decision on "the factual substantiation of the verdict and the validity of the sentence." Although chapter 23A-27A is not specific as to the appropriate standard of review of proportionality in death penalty cases, our capital punishment statutory scheme seems to contemplate a heightened review by this Court. We agree with the Arizona Supreme Court in *Arizona v. Watson*, 628 P2d 943, 946 (Ariz 1981), when it observed:

> The question before us is not whether the trial court properly imposed the death penalty but whether, based upon the record before us, we believe that the death penalty should be imposed. A finding merely that the imposition of the death penalty by the trial court was "factually supported" or "justified by the evidence" is not the separate and independent judgment by this court that the death penalty warrants. This is in keeping with the mandate of the United States Supreme Court that we must review carefully and with consistency death penalty cases and not engage in "cursory" or "rubber stamp" type of review.

(citing Proffitt v. Florida, 428 US 242, 96 SCt 2960, 49 LEd2d 913 (1976)).

[¶84.] Nevertheless, the trial court remains the finder of fact and this Court does not resolve conflicts in evidence, pass on credibility of the evidence, or weigh the evidence in a court trial any more than it does in a jury case. State v. Romero, 269 NW2d 791 (SD 1978). Having no witnesses appear before us, we are unable to resolve conflicts in the evidence, pass on witness credibility or weigh evidence. State v. Burtzlaff, 493 NW2d 1, 4-5 (SD 1992).

[¶85.] In sum, the Supreme Court's opinions in *Enmund* and *Tison* require this Court to focus upon the relative culpability of each co-defendant in the commission of the capital offense. *See Enmund,* 458 US 782, 102 SCt 3368, 73 LEd2d 1140; *Tison*, 481 US 137, 107 SCt 1676, 95 LEd2d 127. In gauging the culpability of each defendant, this Court will first seek to ascertain whether or not the defendant actively participated in the crime or crimes and whether the defendant either intended to murder the victim or acted with reckless disregard for human life. The purpose of this inquiry is to distinguish the more passive accomplices from those who were active in committing the capital offense. In order to make this distinction, this Court will focus upon the relative actions and roles exhibited by the defendants.

Jurisprudence from other jurisdictions strongly suggests that factors such as leadership in the crime or having been the "triggerman" are relevant and should be established by substantial, competent evidence. *See supra* ¶80.

[¶86.]        In assessing the relative culpability for Poage's murder, we acknowledge that the statements of co-defendants Piper, Page, and Hoadley are not all consistent with each other. This Court, however, will only consider Piper's own statements concerning his actions and his differentiations between his acts and those of Hoadley. The circuit court indicated on the record it did the same. The analysis requires this Court to do likewise because Piper, Page and Hoadley never testified under oath and were never subject to cross-examination. The statements of Piper and Page given at the time of their arrest seek to minimize their individual involvement to some extent and place the bulk of the blame for the planning and execution of this crime on the other. Nevertheless, this does not require us to accept at face value all the evidence and inferences brought forward by Piper. *See* State v. Anderberg, 89 SD 75, 80, 228 NW2d 631, 635 (1975).

[¶87.]        After extensive review of the record, we conclude that Piper's degree of criminal involvement was not equal to co-defendant Hoadley's participation in Poage's murder.[24]  In other words, there was a genuine and substantial difference

---

24.    Because Piper pleaded guilty to murdering Poage amongst other charges, there is no dispute in this case that Piper either intended to murder the victim or acted with recklessly disregard for human life. Therefore, his culpability for Poage's murder is based upon his own actions rather than those of his co-defendants Page and Hoadley. *See* discussion *supra* ¶¶78-79, concerning the import of the Supreme Court's decisions in *Enmund* and *Tison.*

between the actions of Piper and Hoadley which increased Piper's moral culpability for the violence and torture inflicted upon Poage. Piper, unlike Hoadley, openly discussed in front of the victim the various ways they might accomplish the murder. Although there was some finger pointing between Piper and Page as to whom originally thought of the attack on Poage, Hoadley was never mentioned by Piper as an instigator of the murder. When informed of the existing plot by Piper and Page, Piper stated that Hoadley agreed to back them up. At the house while Piper and Page were kicking Poage in the head, threatening him with a gun and making him drink the hydrochloric acid mixture, Piper described Hoadley as merely a bystander watching in disbelief.

[¶88.] Nor does the record show that Hoadley joked or taunted Poage during the attack. Piper was the defendant who falsely told Poage he would be allowed to warm himself in the vehicle if he first washed the blood off himself.

[¶89.] Perhaps most importantly, the record tends to show that Piper was the leader in planning and carrying out Poage's murder, whereas Hoadley was a follower. While Piper and Page were torturing Poage at Higgins Gulch, Piper said of Hoadley at one point, "He's just standing there. … He looked like a petrified tree, standing just like in the same footprints[.]"

[¶90.] Piper also argues that he did not actually kill Poage as he was up in Poage's vehicle when the rocks were dropped on Poage's head to end the hours of torture. However, his argument is factually challenged by Dr. Habbe who testified that the cause of death was "[t]he blunt force and the sharp force injuries. In other words, the stab wounds and the blunt force injury to the head." The stab wounds that

came before the rock throwing and that were administered at least in part by Piper, were described by Dr. Habbe as potentially lethal wounds. Moreover, Piper planned and directed the plot from its inception. He cites to no authority which holds less culpable the masterminds of a murder plot while more severely punishing those who assist in carrying it out.

[¶91.] The record indicates Hoadley was remorseful for his actions. In contrast, Piper showed a complete lack of remorse for his actions. Just prior to his sentencing, Piper gave a tearful statement of remorse to the circuit court and the Poage family.[25] Piper's behavior outside the courtroom was markedly different.

_____

25. Piper told the Court:

> I participated in all of this, the beating, the torture, and the killing of someone's son. And I'm so sorry. I'm so sorry for what I did. And you lost your son, you've lost your brother, you've lost your grandson. Your whole family. There's nothing that I can say and there's nothing that I can do that will ever bring, your son back. If I thought that this judge can kill me and your son could take my place and be alive and you could have him back, I'd go right now. I'd run to the table, I'd sit down, and I would die so you could have your son back, so you could have your brother back, because I know if someone killed my brother or my sister, or any member of my family, I-I would want them dead. But then like Pat said, I would want them to live forever so that they would have to live with it and it would have to eat at them every day that they live. And there's not a day that goes by, there's not a night that I lay down to sleep, that I don't see your son's face, that I don't go over everything that happened in my mind and wish to God I could go back and I could stop it. That I could run for help. That he would be okay. I don't know what I can say. I don't know that I can say to you, Judge. I'm so sorry and so ashamed for what I took part in. I'll never be able to forgive myself, let alone expect any of your forgiveness, ever. I'll never be able to deal with all the pain that I've caused your family, as well as mine. And even families that aren't involved in this. Mr. Fitzgerald's family, the Judge's family, the law clerk's family over here. I'm—It's affected everybody in this whole state, and everybody I know in the state where I'm from, and the state where Elijah Page is from.

(continued . . .)

Several individuals testified at Piper's sentencing hearing and related that during this period of time Piper was gleefully willing to relive the details of his activities in the killing.  For instance, witness C.R. described Piper's rendition of his own murderous actions as "[h]e was just kind of like laughing about it and thought it was just like a really cool neat thing, I guess, and so — I mean, he just gets really excited[.]"  Prisoner Jeff Deux testified that "[h]e just said it would be kind of a weird experience to kill somebody."  Piper told Christine Fanger "I always wanted to know what it felt like to kill someone."  When describing to prisoner Tom Curtis his stabbing of Poage with a knife, Curtis found Piper "like he was reading out of a joke book or something like it was funny."  Prisoner Givens was asked about Piper's demeanor as Piper explained the specific details of the torture and murder.

---

(. . . continued)

> I just don't know what else I can say but I'm sorry.  I'm so sorry for what I did.  And I hope now that-that this part-just of three parts is done, and maybe some ounce-some little part of healing-no forgiveness ever, because I know it's inexcusable, what happened, but I hope now that just one-third of this part can be over and that you can get on to seeking retribution for the other two-thirds.  I don't know what this Judge is going to do.  I don't.  And I understand what you all want him to do.  I understand.  I helped take the son of a mother, the brother from a sister, I helped take a member of an undoubtedly loving family.  But I don't know what he's going to do.  But I'll accept responsibility for everything I've done, and I'll accept his punishment and I'll take it in full for every day of my life.  There will never be a day that I'll forget about what's happened here in the past nine months, and past ten months, for the past year and a half.  I'll never forget.
>
> I have two nieces and nephews that I don't even want them to know that they have an uncle like me.  I don't want them to grow up to be like me.  As much as I love them, I don't want them to ever know that I existed.  I don't ever want them to know the horror that I took part in, all the pain that I've caused another family to feel.  I don't want them to know that.  I don't want them to have any part of it.  Maybe I don't want them to deal with the pain when they get older.  I don't know what else I can say.  I'm sorry.  I'm sorry, Judge.

According to Givens, "[b]asically he had no remorse." Not a single witness took the stand to dispute these witnesses or their opinions concerning Piper's lack of remorse.

[¶92.] While Piper was incarcerated in the Lawrence County jail for this proceeding, he formulated an escape plan and tried to enlist other prisoners in its execution. The plan called for an escape in which two female guards would be taken hostage and ultimately killed. Piper also indicated he wanted to kill Page as he suspected Page had cooperated with the law enforcement against him.

[¶93.] As far as a comparison of backgrounds, Hoadley "had an unfortunate childhood and suffered some difficult childhood experiences." The record also indicates he had some prior incidents involving threats of violence. On the other hand, it is clear that Piper was raised in a loving family and suffered no childhood traumas. Prior to his teen-age years he gave no one cause for concern. However, that radically changed. Even though he had the intelligence to complete high school and enter college, he had become heavily involved in the illegal drug culture. By the time he reached Spearfish, South Dakota, he had become a dealer in drugs and was capable of manipulating or getting others to do tasks, be it legal or illegal, which he wanted done. The circuit court referred to this just prior to passing sentence when it said, "[t]here's no doubt that at one time you were a good kid and a good scout. Somehow, within a few short years, you went from being a good son to a thief, a thug, and eventually a killer." While the reliability of some of the evidence of his involvement in previous illegal acts is in doubt, his overall personality traits are not.

[¶94.] The circuit court factually concluded:

> The Court has determined sincerity based upon its opportunity to observe [Piper] during the proceeding. Defendant Piper's lack of remorse and insincerity evidenced throughout the proceedings was, in fact, dissimilar from Defendant Hoadley.
>
> Defendant Piper's leadership role, and his greater participation in planning, direction, and execution of the murder and his relishing of the killing during and after the crime, distinguishes his degree of culpability from Defendant Hoadley's.
>
> Defendant Piper's plan to escape, including killing guards, attempting to recruit other prisoners in his scheme, further distinguished his behavior from that of Defendant Hoadley's.

[¶95.] If Hoadley had been absent that fateful day, there is nothing in the record to indicate that the torture/murder of Poage would not have taken place anyway. Piper and Page jointly planned and initiated it. On the other hand, if Piper had not been present that day, there is no evidence to indicate that Hoadley would have planned and executed the murder. Nor has Piper's "curiosity" with committing murder apparently been satisfied. He remains a threat to prison guards and anyone who would have the potential to come into contact with him.

[¶96.] As we observed in *Rhines I*, "a death sentence should not be invalidated simply because a jury determined that another defendant, who committed an analogous crime, deserved mercy. Proportionality review focuses not only on the crime, but also on the defendant." 1996 SD 55, ¶206, 548 NW2d at 457 (citing SDCL 23A-27A-12(3)); State v. Benn, 845 P2d 289, 317 (Wash 1993) (holding "[s]imply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it") (quoting State v. Lord, 822 P2d 177, 233 (Wash 1991), *cert.*

1991), *cert. denied*, 510 US 944, 114 SCt 382, 126 LEd2d 331 (1993)). The record shows Piper's conduct and general culpability for the murder of Poage, including the particularly heinous aggravating circumstances, were not the same as Hoadley's. Therefore, under our analysis as set forth in *Bonner*, the circumstances of Piper's case do not suggest gross disproportionality in light of Hoadley's sentence.

[¶97.]    Affirmed.

[¶98.]    KONENKAMP and ZINTER, Justices, concur.

[¶99.]    SABERS and MEIERHENRY, Justices, dissent.


SABERS, Justice (dissenting).

[¶100.]    I respectfully dissent. South Dakota's capital sentencing scheme prevents a defendant who pleads guilty from having the alleged aggravating circumstances found by a jury. The scheme is therefore unconstitutional under *Apprendi, Ring* and *Blakely* and the majority opinion violates canons of statutory construction by ignoring statutory language to come to the conclusion that the sentencing procedure is constitutional. I also dissent from the majority opinion's conclusion that Piper and Page's sentences were not disproportionate in comparison to their co-defendant, Hoadley. We should reverse and remand for re-sentencing to life in prison without the possibility of parole.

[¶101.]    **1.    South Dakota's capital sentencing scheme in nonjury trials violates the Sixth Amendment right to a jury trial as incorporated to the states through the Fourteenth Amendment.**

[¶102.]    *Apprendi v. New Jersey* held:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

530 US 466, 490, 120 SCt 2348, 2362, 147 LEd2d 435.

[¶103.]     In *Ring v. Arizona*, the Court applied its holding in *Apprendi* to hold that a capital defendant's Sixth Amendment rights were violated when the judge "imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding." Blakely v. Washington, 542 US 296, 303, 124 SCt 2531, 2537, 159 LEd2d 403 (2004) (citing *Ring,* 536 US at 603-609, 122 SCt 2428, 153 LEd2d 556). Specifically, under Arizona's capital sentencing scheme, once the jury found a defendant guilty of first-degree murder, the judge was required to "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated aggravating] circumstances ... for the purpose of determining the sentence to be imposed." The judge was required to make all of the factual findings regarding the question whether there were any aggravating circumstances. The Court wrote:

> Based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment. [] This was so because, in Arizona, a "death sentence may not legally be imposed  ... unless at least one aggravating factor is found to exist beyond a reasonable doubt." [] The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, [] made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury. []

*Ring,* 536 US at 597, 122 SCt at 2437, 153 LEd2d 556. The Court held that the aggravating factor determination had to be entrusted to the jury in order to preserve defendants' Sixth Amendment rights. *Id.*

[¶104.] In *Blakely v. Washington*, the defendant pleaded guilty to kidnapping his wife. 542 US at 298, 124 SCt at 2534, 159 LEd2d 403. The facts supporting his guilty plea made him eligible for a maximum sentence of 53 months. *Id.* at 299, 124 SCt at 2535, 159 LEd2d 403. The Court sentenced him to 90 months after making a finding that he acted with "deliberate cruelty." *Id.* The trial court received the authority to enhance the sentence from the Washington criminal code, which provided that a trial court was entitled to impose a sentence above the standard range if it found "substantial and compelling reasons justifying an exceptional sentence." *Id.* at 299, 124 SCt at 2535, 159 LEd2d 403. The United States Supreme Court overturned the sentence, relying on *Ring* and *Apprendi,* stating:

> Our precedents make clear [] that the "statutory maximum" for
> *Apprendi* purposes is the maximum sentence a judge may impose
> *solely on the basis of the facts reflected in the jury verdict or
> admitted by the defendant. See Ring,* at 602, 122 SCt 2428 ("'the
> maximum he would receive if punished according to the facts
> reflected in the jury verdict alone.'" (quoting *Apprendi, supra,* at
> 483, 120 SCt 2348)); *Harris v. United States,* 536 US 545, 563,
> 122 SCt 2406, 153 LEd2d 524 (2002) (plurality opinion) (same); *cf.
> Apprendi, supra,* at 488, 120 SCt 2348 (facts admitted by the
> defendant). In other words, the relevant "statutory maximum" is
> not the maximum sentence a judge may impose after finding
> additional facts, but the maximum he may impose *without* any
> additional findings. When a judge inflicts punishment that the
> jury's verdict alone does not allow, the jury has not found all the
> facts "which the law makes essential to the punishment," *Bishop*,
> *supra,* § 87, at 55, and the judge exceeds his proper authority.

*Id.* at 542 US 303-304, 124 SCt at 2537, 159 LEd2d 403 (emphasis in original). This line of cases makes clear that absent a valid knowing and voluntary waiver of the Sixth Amendment right to a jury trial, a judge may only sentence based on "the facts reflected in the jury verdict or admitted by the defendant." In other words, in a capital case, absent valid waiver, the defendant has a right to have a jury determine the facts regarding whether there are aggravating circumstances. Allowing the court to impose the death penalty based on facts not admitted by the defendant or found by the jury is a violation of the defendant's Sixth Amendment right to a jury trial.

[¶105.]    Turning to South Dakota's capital sentencing scheme, one can

see that the plain language of the statute dealing with nonjury trials violates the

clear principles enunciated in *Apprendi, Ring* and *Blakely.*

[¶106.]    SDCL 23A-27A-2 provides:

> In all cases in which the death penalty may be imposed and *which are tried by a jury*, upon a return of a verdict of guilty *by the jury*, the court shall resume the trial and conduct a presentence hearing before the jury.  Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment.  At such hearing *the jury shall receive all relevant evidence,* including:
>> (1) Evidence supporting any of the aggravating circumstances listed under § 23A-27A-1;
>> (2) Testimony regarding the impact of the crime on the victim's family;
>> (3) Any prior criminal or juvenile record of the defendant and such information about the defendant's characteristics, the defendant's financial condition, and the circumstances of the defendant's behavior as may be helpful in imposing sentence;
>> (4) All evidence concerning any mitigating circumstances.

(emphasis added).

[¶107.]    SDCL 23A-27A-6 provides:

> In nonjury cases *the judge shall*, after conducting the presentence hearing as provided in § 23A-27A-2*, designate, in writing, the aggravating circumstance or circumstances, if any, which <u>he</u> found beyond a reasonable doubt.*  Unless at least one of the statutory aggravating circumstances enumerated in § 23A-27A-1 is so found, the death penalty shall not be imposed.

(emphasis added).

[¶108.]    The majority opinion concludes that there is no "statutory impediment

preventing a defendant who pleads guilty … from exercising his right to a jury at the

penalty phase." *Supra ¶48.*  However, to come to this conclusion, it is necessary to

ignore pivotal language in the pertinent statutes. First, SDCL 23A-27A-2 provides for a sentencing hearing before a jury: "[i]n all cases in which the death penalty may be imposed and *which are tried by a jury*[.]" (emphasis added). The jury hearing on aggravating circumstances is clearly inapplicable in nonjury cases. This interpretation is supported by the fact that the Legislature provided a different statute and procedure for sentencing in nonjury cases under SDCL 23A-27A-6. SDCL 23A-27A-6 unequivocally requires the *judge* to make the factual findings regarding aggravating circumstances in nonjury cases. *See* SDCL 23A-27A-6 (providing in part, "[i]n non-jury cases *the judge shall* [] designate, in writing, the aggravating circumstance or circumstances, if any, *which he found* beyond a reasonable doubt").

[¶109.]     The majority opinion relies solely on the phrase, "presentence hearing as provided in § 23A-27A-2" to support its determination that a jury hearing is permitted by the statute. This reliance is appropriate only if the Court chooses to wholly ignore the plain language surrounding that phrase and the plain language of SDCL 23A-27A-2. That language makes clear that the Legislature intended that the court, not a jury, hear the evidence and make written findings regarding aggravating circumstances in nonjury cases. This is in direct contravention of the Supreme Court's holding in *Apprendi,* which this Court acknowledged in *State v. Hoadley,* that:

> it is unconstitutional for a [state] legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.

*Apprendi,* 530 US at 490, 120 SCt at 2363, 147 LEd2d 435; *Hoadley,* 2002 SD 109, ¶32, 651 NW2d 249, 257.

[¶110.]     I acknowledge and embrace the canon of statutory construction requiring this Court, whenever possible, to construe statutes so as to not violate the constitution. *Supra* ¶50. However, that canon of statutory construction cannot be used by the Court to simply ignore the operative language of two statutes in order to find them constitutional. This is especially so when the Court is considering statutes dealing with the most severe penalty under the law. We should not broaden our rules of construction to the point of absurdity in an effort to drive to a desired result. Instead, we should carefully consider the plain language of the statutes and follow our constitutional duty to strike down those statutes which violate our citizens' rights.

[¶111.]     Lacking any statutory support for its conclusions, the majority opinion goes on to hold that the defendants waived their constitutional right to have a jury determine whether they would receive death or life in prison. This conclusion is based on the erroneous premise that the "circuit court properly presented Page [and Piper] with the option of exercising [the] right to sentencing by a jury as provided by South Dakota's capital punishment statutory scheme." There is no such right for defendants who plead guilty to capital crimes under the sentencing scheme. Therefore, this holding has no anchor in the law. As Page notes, "the waiver of a substantive right presupposes the existence of the right in the first place. The language of the statute expressly limits the fact-finding role to the judge in non-jury cases ... the judge ... had no authority to offer jury sentencing once [the defendants]

pleaded guilty." That the circuit court made an illusory offer of jury sentencing is no justification for upholding an unconstitutionally imposed death sentence. Therefore, under these circumstances, the aggravating factors had to be admitted by the defendant or found by a jury, not the judge, and the penalty of death was unconstitutionally imposed.

[¶112.]    The United States Supreme Court could not have been more clear on this issue than when it stated that the right to a jury determination of the facts essential to imposition of sentencing:

> is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the peoples' ultimate control in the legislative and executive branches, jury trial is meant to ensure their control of the judiciary.

*Blakely,* 542 US at 306, 124 SCt at 2538-39, 159 LEd2d 403. The defendants' unconstitutionally imposed sentences should be reversed and the cases remanded for re-sentencing in accordance with SDCL 23A-27A-14.

[¶113.]    In foresight, the South Dakota State Legislature has specifically provided the appropriate remedy.

[¶114.]    SDCL 23A-27A-14 provides:

> In the event the death penalty for a Class A felony is held to be unconstitutional by the South Dakota Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a Class A felony shall have such person brought before the court, and the court shall sentence such person to life imprisonment.

[¶115.]    **2.      Piper and Page's death sentences were grossly disproportionate in comparison to Hoadley's life**

**sentence.**[26]

[¶116.] Based primarily on untested, un-cross-examined and self-serving statements by Hoadley, Piper and Page, the circuit court and the majority opinion comes to the conclusion that Piper and Page were more culpable and less remorseful than Hoadley, and therefore more deserving of death. In a stunning reversal from its argument in the Hoadley case, the State now argues that Hoadley is less culpable in this horrendous crime than Piper and Page. The majority opinion relies on the tenuous reasoning that Hoadley did not confess to being as violent or proactive as Piper and Page. Hoadley's penchant for self-preservation is a shifting foundation that is utterly insufficient to support the gross disparity in sentencing of death for Piper and Page, and life for Hoadley. We should reverse the circuit court's determination that the sentences were not grossly disproportionate.

[¶117.] Sifting through thousands of pages of trial transcripts, defendant statements, and investigative reports, one could write reams detailing the atrocities committed by Hoadley, Piper and Page. In the end, their individual behavior is so despicable as to be indistinguishable. Yet, the circuit court and the majority opinion parse selected facts, microanalyzing the events of the night to determine whether Piper and Page were worse than Hoadley.

[¶118.] The problem with this analysis is that it places this Court and

---

26. Because the factors for consideration in all three cases (Piper, Page, and Hoadley) are exactly the same and the facts substantially similar, I respectfully submit the same writing, analysis and arguments in the Piper and Page cases.

the circuit court in a position of picking and choosing which untested facts to believe and then using those facts to sentence one defendant to a life sentence and two others to death.[27]  Certainly, this type of fact finding is always done in determining whether there are sufficient aggravating factors to warrant imposition of the death sentence. However, the fact finders in all of these cases have already determined that the defendants had the same aggravating factors.  Yet only one received mercy.  All of the defendants have been found guilty of the same crimes, yet two will be put to death for those crimes.  This is not a case where one defendant acted as a lookout or drove the getaway car.  As the State consistently argued below, all three defendants actively engaged in the crimes that occurred on the evening Poage was murdered.

---

27.   This problem is exacerbated by the circuit court's performance on remand.  For example, in Page's case, the circuit court did not engage in true comparative analysis of the actions of Hoadley and Page.  Instead, the circuit court appears to have sifted through the record and reiterated all of the facts it could find in favor of its original sentence.  The findings of fact and conclusions of law do not compare the culpability of Page and Hoadley, they merely restate facts regarding Page's culpability.  The majority opinion supports this improper analysis by giving deference to those findings.  However, without any significant findings with regard to Hoadley's actions before, during, and after the murder, it cannot be said that "Hoadley's 'past records, demeanor, [and] degree of criminal involvement'" are dissimilar enough to warrant such disparity in sentencing.

In fact, the majority opinion ignores those facts that show Hoadley's conduct to be equal or more heinous than that of Piper and Page.  It does so despite the fact that the Hoadley trial and sentencing transcripts are part of the record in this appeal.  Those transcripts show that Hoadley (1) wiped up the blood in the kitchen after the initial assault; (2) stabbed Poage in the throat; (3) stood on the back of Poage's head in an attempt to drown him; (4) dropped two massive rocks on Poage's head; (5) kept property used in the murder as souvenirs, including the dog leash used to bind Poage; (6) when a friend asked him about

(continued . . .)

[¶119.] In fact, the State charged Hoadley, Piper and Page with identical acts, conduct and charges, all resulting in identical convictions. The same aggravating factors were alleged and found against all three: Hoadley, Piper and Page. There are no meaningful differences to justify life for Hoadley and death for Piper and Page. The real substantial difference was that the jury gave life to Hoadley, and the judge gave death to Piper and Page.

[¶120.] I respectfully submit all three, Hoadley, Piper and Page, should receive life in prison without the possibility of parole for their substantially identical acts of murder. *See* SDCL 23A-27A-14, *supra* ¶114 .

[¶121.] MEIERHENRY, Justice, joins this dissent.

---

(. . . continued)

the murder, Hoadley replied, "shit happens, dude;" and (7) showed pictures of himself wearing Poage's clothes to his cellmates.